**Rudy PERPICH, Governor of the State of Minnesota, and the State of Minnesota, by its Attorney General, Hubert H. Humphrey, III, Plaintiffs,**

v.

**UNITED STATES DEPARTMENT OF DEFENSE; United States Department of the Air Force; United States Department of the Army; National Guard Bureau; Caspar W. Weinberger, Secretary of Defense; John O. Marsh, Jr., Secretary of the Army; Edward C. Aldridge, Secretary of the Air Force, and Lieutenant General Herbert R. Temple, Jr., Chief, National Guard Bureau, Defendants.**

No. 3–87 CIV 54.

United States District Court,
D. Minnesota,
Third Division.

Aug. 4, 1987.

Richard K. Willard, Asst. Atty. Gen. and Jerome G. Arnold, U.S. Atty. by Vincent M. Garvey, Leslie K. Shedlin, Washington, D.C., and John Lee, Minneapolis, Minn., for defendants.

Hubert H. Humphrey, III, Atty. Gen., for the State of Minn. by John R. Tunheim and Peter M. Ackerberg, St. Paul, Minn., for plaintiffs.

## MEMORANDUM ORDER

ALSOP, Chief Judge.

This matter came before the court on June 15, 1987, upon motions brought by both sides to the lawsuit. Defendants move for a dismissal for failure to state a claim upon which relief can be granted. Fed.R.Civ.P. 12(b)(6). Because defendants submitted materials outside the pleadings, the court shall treat this motion as one for summary judgment. Fed.R.Civ.P. 12(b). For their part, plaintiffs move the court for summary judgment in their favor. Both parties agree that there exist for resolution no disputed issues of fact, and this matter is ripe for summary judgment.

The court reiterates its gratitude to the parties, amici, and their counsel for the able and helpful manner in which they have prepared and submitted this case.

### STATUTORY BACKGROUND

Broadly stated, the issue before the court in this action is the status of the National Guard under the United States Constitution. The term "National Guard" refers to two overlapping, but legally distinct, organizations. Congress, under its constitutional authority to "raise and support armies" has created the National Guard of the United States, a federal organization comprised of state national guard units and their members.[1] These state units also maintain an identity as state national guards, part of the militia described in Article I, Section 8 of the Constitution.

Congress has regulated the National Guard under provisions found in Titles 10 and 32 of the United States Code. The

---

1. *See* H.R.Rep. No. 141, 73rd Cong., 1st Sess. 2–5 (1933); *Wiener, The Militia Clause of the Constitution,* 54 Harv.L.Rev. 181, 208, 208 n. 153 (1940).

provisions in Title 10 relevant to the National Guard deal exclusively with the National Guard of the United States, a ready reserve component of the Army and Air Force. Sections 672(b) and (d) of Title 10 pertain to the active duty of units or members of the National Guard of the United States:

672. Reserve components generally

\* \* \* \* \* \*

(b) At any time, an authority designated by the Secretary concerned may, without the consent of the persons affected, order any unit, and any member not assigned to a unit organized to serve as a unit, in an active status in a reserve component under the jurisdiction of that Secretary to active duty for not more than 15 days a year. However, units and members of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor of the State or Territory, Puerto Rico, or the Canal Zone, or the commanding general of the District of Columbia National Guard, as the case may be.

\* \* \* \* \* \*

(d) At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member. However, a member of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor or other appropriate authority of the State or Territory, Puerto Rico, the Canal Zone, or

the District of Columbia, whichever is concerned.

\* \* \* \* \* \*

In 1985 and 1986, several governors either withheld their consent under the provisions of §§ 672(b) and 672(d) and objected to the active duty deployment of National Guard personnel to Central America or indicated their intention to do so. *See* 132 Cong.Rec. H6264–H6268 (daily ed. Aug. 14, 1986). In response to these actions, Congress enacted an amendment offered by Representative Montgomery which precludes governors from withholding their consent under §§ 672(b) and 672(d) because of objections to location, purpose, type, or schedule of the active duty.[2]

**UNDISPUTED FACTS**

Pursuant to §§ 672(b) or 672(d) of Title 10, United States Code, defendants ordered members of the Minnesota National Guard to active duty for training missions in Central America. These missions were conducted January 3–17, January 9–25, and January 22–26, 1987. Plaintiff Rudy Perpich, Governor of Minnesota, would not have consented to one of the training missions ordered by defendants in January 1987 but for the restrictions imposed by § 672(f). Plaintiffs expect the defendants will order members of the Minnesota unit of the National Guard to active duty for training purposes outside the United States in the future, and plaintiff Perpich intends to withhold consent to defendants' orders if he objects to the location, purpose, type, or schedule of such training.

**DISCUSSION**

Plaintiffs contend the Montgomery amendment offends the Militia clause of the Constitution[3] by impermissibly imping-

**2.** 10 U.S.C. § 672(f):

The consent of a Governor described in subsections (b) and (d) may not be withheld (in whole or in part) with regard to active duty outside the United States, its territories, and its possessions, because of any objection to the location, purpose, type, or schedule of such active duty.

**3.** Art. I, § 8:

The Congress shall have Power ...
Cl. 15:

To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions.
Cl. 16:
To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.

ing upon the states' "authority of training the militia." Plaintiffs argue that the Militia clause reserves to each state exclusive power over training of the National Guard,[4] and this reservation requires that Congress obtain gubernatorial consent to training during peace time. Plaintiffs further argue that neither the Army clause [5] nor the Necessary and Proper clause [6] negates the reservation of peace time training authority over the National Guard found in the Militia clause.

When ordered to active duty under § 672, defendants argue, the National Guard is "Employed in the Service of the United States." *See* Art. I, Sec. 8, cl. 16. In this status, defendants assert, the National Guard is governed by Congress' plenary power under the Army and Necessary and Proper clauses to provide for the national defense. Defendants contend that the reservation to the states of authority over training the guard simply does not come into play while the National Guard is employed in the service of the United States.

Although this action arises out of a dispute between the parties over the propriety of deploying elements of the Minnesota Unit of the National Guard to Central America for training purposes, the court emphasizes that the wisdom of that deployment is in no sense an issue in this case. Judgment as to the wisdom of this program lies exclusively within the purview of the political branches of government. This court must determine only whether Congress has the power to act as it has.

**I. Historical Development of National Guard**

An understanding of the historical development of the National Guard, particularly as it relates to the evolution of the Guard's dual status, is necessary to a resolution of the parties' dispute. From the time of the Constitution's ratification through the Spanish-American War, the militia, which became known as the National Guards in the latter half of the nineteenth century, was a loosely trained force best suited to drills and "showy parades in harlequin uniforms." *See Wiener, The Militia Clause of the Constitution,* 54 Harv.L.Rev. 181, 191 (1940) (hereinafter *"The Militia Clause"*); *Federal Aid in Domestic Disturbances,* Sen.Doc. No. 263, 67th Cong., 2nd Sess. 205 (1922). As in each previous conflict the nation experienced, the National Guards' performance in the Spanish-American War was unsatisfactory. Some units stood upon their constitutional rights and refused to serve outside the United States. *The Militia Clause, supra,* at 192. Because of inadequate and incompatible training, those units that did serve did so ineffectually. *Id.*

Dissatisfaction with the National Guards' performance in the Spanish-American War lead Congress in 1903 to enact the Dick Act, a program of financial grants to state National Guard units. Units receiving grants were required to conform to national standards, including the requirement for drill at least 24 times per year and attendance at a five day summer camp. *Id.* The National Defense Act of 1916 further expanded the federal government's involvement in the maintenance and training of the National Guard. In addition to reorganizing and expanding the Regular Army and creating an Officers Reserve Corp, the Act restructured the National Guard to enable it to serve as an integral component of the Army of the United States. This restructuring dramatically increased the scope of federal control over the guard by expanding federal financial support for Guard units, prescribing the qualifications of National Guard officers, and providing for their recognition by federal authorities only should they be found qualified. The 1916 Act also required every officer and enlisted man in the National Guard to take a dual oath to support the Nation as well as the State, and to obey not only the

---

**4.** "The National Guard is the modern Militia reserved to the states by Art. I, § 8, cl. 15, 16 of the Constitution." *Maryland v. United States,* 381 U.S. 41, 46, 85 S.Ct. 1293, 1297, 14 L.Ed.2d 205 (1965) (citation omitted).

**5.** Art. I, § 8, cl. 12.

**6.** Art. I, § 8, cl. 18.

governor but also the president. *Id.* at 200–201.

In the years following World War I, the National Guard again was reconstituted. During this time, the nation was moving toward a "One Army" concept, under which the Regular Army and the various reserve and militia organizations were unified under the administration and command of The United States Army. *Id.* at 207. In time of peace, however, the National Guard was not yet a part of the Army: "the Army of the United States shall consist of the Regular Army, the National Guard while in the service of the United States, and the Organized Reserves, including the Officers Reserve Corp and the Enlisted Reserve Corp." National Defense Act, § 1, as amended in 1920, 41 Stat. 759 (1920); *The Militia Clause, supra,* at 207.

In 1933, Congress amended the National Defense Act to create the National Guard of the United States as a reserve component of the Army of the United States. Act of June 15, 1933, 48 Stat. 153, 155. In this capacity, the National Guard of the United States was organized and was to be administered under the Army Clause. *The Militia Clause, supra,* at 208; *see* H.R. Rep. No. 141, 73rd Cong., 1st Sess. 2–5 (1933). In the Armed Forces Reserve Act of 1952, Congress enacted forerunners of the current gubernatorial consent provisions of 10 U.S.C. §§ 672(b) and 672(d). Act of July 9, 1952, ch. 608, §§ 233(c) and 233(d), 66 Stat. 481, 490. Congress enacted these provisions in response to objections from state National Guard officials who sought to limit the scope of the federalization of the National Guard in part on constitutional grounds. *Armed Forces Reserve Act: Hearings on H.R. 5426 Before the Senate Subcommittee on Armed Services,* 82nd Cong., 2nd Sess., 127, 246, 310, 312 (1952). Following the Armed Forces Reserve Act of 1952, no further changes relevant to this action were made in the legal status of the National Guard until the enactment of the Montgomery amendment in 1986.

The Guard's status as a reserve component of the United States armed forces, however, continued to evolve. Today, as a part of the nation's Total Force military capability, 18 of the 24 Total Army divisions available in the event of war would be provided in whole or in part by the Army National Guard. Similarly, the Air National Guard provides 73 percent of the nation's air defense interceptor forces, 52 percent of tactical air reconnaissance, 34 percent of tactical airlift, 25 percent of tactical fighters, 17 percent of aerial refueling, 13 percent of air rescue and recovery forces, 14 percent of special operations forces, and 24 percent of tactical air support forces. *Declaration of James H. Webb, Jr.,* Attached Statement at 1. Thus the National Guard has assumed a significant role in the nation's military readiness program.

## II. Analysis

All authority to provide for the national defense resides in Congress, and state governors have never had, and never could have jurisdiction in this area. *The Selective Draft Law Cases,* 245 U.S. 366, 383, 38 S.Ct. 159, 163, 62 L.Ed. 349 (1918); *Houston v. Moore,* 5 Wheat. 1, 16, 5 L.Ed. 19 (1820). For example, Article I, Section 10, Clause 3 of the Constitution prohibits states from keeping troops or ships of war in time of peace and from engaging in war, unless actually invaded. In addition, the Militia clause has not been read to restrict Congress' plenary authority to provide for the national defense. *The Selective Draft Law Cases,* 245 U.S. at 383, 38 S.Ct. at 163.

 Congress' establishment of the dual enlistment system, under which National Guard members serve as members of both a state national guard and of the National Guard of the United States, is a valid exercise of Congressional power under the Army and Necessary and Proper clauses. *Johnson v. Powell,* 414 F.2d 1060, 1063–64 (5th Cir.1969); *Drifka v. Brainaird,* 294 F.Supp. 425, 428 (W.D.Wash. 1968); *see* H.R.Rep. No. 141, 73rd Cong., 1st Sess. 2–5 (1933). Thus an authority designated by the Secretary of Defense or

the Secretary of a military department may call National Guard units and members to active duty under § 672(b) and 672(d) and the Militia clause does not inhibit this power. *See The Selective Draft Law Cases*, 245 U.S. at 383, 38 S.Ct. at 163; *Johnson*, 414 F.2d at 1064. Because Congress' authority to provide for the National defense is plenary, the Militia clause also cannot constrain Congress' authority to train the Guard as it sees fit when the Guard is called to active federal service.[7]

■ As the Militia clause does not restrain Congress' authority to train the National Guard while the Guard is in active federal service, the gubernatorial veto found in §§ 672(b) and 676(d) is not constitutionally required. Having created the gubernatorial veto as an accommodation to the states, rather than pursuant to a constitutional mandate, the Congress may withdraw the veto without violating the Constitution.

Plaintiffs draw the court's attention to the debate and negotiations over the Militia clause at the Constitutional Convention. Plaintiffs argue that the course of this debate evinces an intent on the part of the framers of the Constitution to preserve in the states what Alexander Hamilton described as a "preponderating influence" over the militia. Federalist No. 29 (Mentor ed.) at 186. Preservation of this local influence, effectuated by reserving to the states authority over training and appointment of officers, served as a check upon the power of the federal government. In particular, the sentiment of the time strongly disfavored standing armies; the common view was that adequate defense of the country and laws could be secured by a militia comprised of men who were civilians primarily, soldiers on occasion. *United States v. Miller*, 307 U.S. 174, 179, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939).

The proposition that the Congress may train the National Guard while the Guard is employed in the service of the United States is not inconsistent with the concerns voiced at the Constitutional Convention. Indeed, the states retain shared control over the training of the Guard while it is not on active federal duty. The states relinquish this authority, and its attending influence, only when Congress calls the National Guard to federal duty pursuant to its authority under the Army and Necessary and Proper clauses. When Congress so acts, the language of the militia clause is relevant only insofar as its provision granting Congress authority "for governing such part of [the militia] as may be employed in the service of the United States," makes it clear that the reservation to the states of the appointment of officers and the authority of training does not restrict the authority of Congress to govern the National Guard while it is in federal service.[8]

■ Plaintiffs further contend the court should recognize that the Militia clause reserves to the states authority over training the National Guard in time of peace, and restricts Congress' training authority to war time. There is no basis for this distinction in the language of the Constitution. Instead, the relevant dichotomy in the constitutional language is between federal service and state service. *See* Article I, sec. 8, cl. 16 ("The Congress shall have Power ... To provide ... for governing such Part of [the militia] as may be employed in the Service of the United States...."). Viewing the reservation to the states of authority over training the militia in light of this dichotomy harmonizes the Army and Militia clauses, and gives each its proper significance. *See, e.g., Fry v. United States*, 421 U.S. 542, 547 n. 7, 95 S.Ct. 1792, 1795 n. 7, 44 L.Ed.2d 363 (1975) (the various provisions

7. *See also* Art. I, § 8, cl. 16 ("The Congress shall have Power ... To provide ... for governing such part of [the militia] as may be employed in the service of the United States").

8. In addition, utilization of the National Guard as a reserve component of the nation's Total Force military capability reduces the need for a large standing army. Reading the Constitution to permit Congress to train the Guard effectively for this mission therefore is consistent with the framers' intent to avoid the establishment of such an army.

of the Constitution are to be construed harmoniously with the states' reserved powers).[9] Thus the court concludes that Congress may exercise plenary authority over the training of the National Guard while the Guard is on active federal duty, and must share with the states authority over training of the Guard only while the Guard is not "employed in the Service of the United States." Under this analysis, Congress acted within its authority in providing for the active duty training of the Minnesota National Guard in Central America without plaintiff Perpich's consent, and plaintiffs' challenge to the Montgomery amendment's constitutionality must fail.

Based upon the foregoing, the arguments and submissions of the parties, and the record as presently constituted,

IT IS ORDERED That plaintiffs' motion for summary judgment be and the same hereby is respectfully denied.

IT IS FURTHER ORDERED That defendants' motion for summary judgment be and the same hereby is granted.

IT IS FINALLY ORDERED That the Clerk enter judgment as follows:

IT IS ORDERED, ADJUDGED, AND DECREED That plaintiffs' action be and the same hereby is dismissed with prejudice.

---

**9.** The position taken by Amici Curiae National Guard Association of the United States, in support of defendants' motion for summary judgment, is inconsistent with this analysis. Amici argue that the Militia clause provision reserving to the states the "Authority of training the Militia *according to the discipline prescribed by Congress*" (emphasis added), gives the Congress unrestricted authority over training the National Guard, whatever its status. Under this view, the Congress apparently could order the National Guard to training exercises outside the United States even without calling the Guard to active

federal duty pursuant to statute. Until the Congress calls the National Guard to active federal duty, however, it lacks the plenary authority provided by the Army and Necessary and Proper clauses, and instead must share authority over training with the states. This necessity of shared authority over training the National Guard when it is not employed in the service of the United States would preclude Congress from exercising the sort of unrestricted control over the National Guard the defendant Amici envision.