**Michael S. DUKAKIS, et al., Plaintiffs,**

**v.**

**UNITED STATES DEPARTMENT OF DEFENSE, et al., Defendants.**

Civ. A. No. 88–227–K.

United States District Court, D. Massachusetts.

May 6, 1988.

Douglas H. Wilkins, Asst. Atty. Gen., Boston, Mass., for plaintiffs.

Vincent M. Garvey, Harriet Kerwin, U.S. Dept. of Justice, Civil Div., Washington, D.C., for defendants.

Peter B. Ellis, Nick Littlefield, Philip W. Mueller, Foley, Hoag & Eliot, Boston, Mass., for amici curiae, Mass. Congressional del.

Francis C. Newton, Jr., Boston, Mass., for amici curiae, Nat. Guard Assoc.

Franklin N. Cunningham, Boston, Mass., for amicus curiae, Boston Chapter, Military Order of the World Wars.

Gary L. Keyser, Asst. Atty. Gen., Baton Rouge, La., W. Arthur Abercrombie, Jr., Sp. Asst. Atty. Gen., Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for amici curiae, State of La., et al.

## OPINION

KEETON, District Judge.

This action was brought by the Governor of Massachusetts and the Commonwealth of Massachusetts against the United States Department of Defense and other federal agencies and officials. Plaintiffs' complaint asks this court to declare the Montgomery Amendment, 10 U.S.C. § 672(f), unconstitutional under the Militia Training Clause, U.S. Const. art. I, § 8, cl. 16, insofar as section 672(f) restricts the authority of the Governor to withhold consent to training, outside the United States, of members or units of the Massachusetts National Guard or the Massachusetts unit of the National Guard of the United States.

On April 8, 1988, the court held a trial on stipulated facts. The court received the parties' Stipulation (Docket No. 11) as the only evidence in the case.

I. Stipulated Facts

Exhibit A to the stipulation of facts is a September 29, 1987, communication from the National Guard Bureau ("NGB") to the Commonwealth of Massachusetts, Military Division. That communication states that "with your concurrence and permission" the NGB will nominate the 65th Public Affairs Detachment, Massachusetts (65th PAD) for a training mission in Central America May 28, 1988 through June 11, 1988. The communication further states that "[i]f you nonconcur, you must provide your reasons or rationale for nonconcurring" by October 15, 1987.

Exhibit B to the stipulation is an October 5, 1987, communication from the Adjutant General of Massachusetts to the NGB, requesting that the October 15, 1987, reply date be extended to November 30, 1987. Exhibit C is an October 30, 1987, memorandum from the Adjutant General to the NGB stating:

> This State submits a nonconcurrence response for the following reasons:
> a. During the period 1 September 1987 through 30 June 1988, there has been an increased demand for public affairs support within the Massachusetts National Guard which has resulted in the assignment of certain assets of the 65th [PAD] to be scheduled to assist in meeting those demands. Certain activities for which the 65th [PAD] has or will be employed are the result of both an increase in and the intensity needed to insure that such activities are carried out effectively. These activities are in addition to those normally conducted by the unit during the course of the year.

The memorandum cites nine such activities planned for members of the 65th PAD.

Exhibit D is a responsive communication from the NGB to the Adjutant General stating, in part:

Your request for nondeployment of the 65th [PAD] to Latin America during FY 88 is not favorably considered.

Exhibit E is a January 25, 1988, letter from the Chief of the NGB to Governor Dukakis. That letter informs the Governor that the Massachusetts National Guard's request to be relieved from the Central American deployment was not approved. The letter further explains that the 65th PAD will perform the training in their "federal status as members of the Army National Guard of the United States," and discusses the provision in section 672(f) that a governor cannot withhold consent to an order to federal active duty outside the United States "because of any objections to the location, purpose, type or schedule of such active duty." The letter concludes by stating:

Section 108 of Title 32, United States Code provides for complete or partial withholding of federal funds from the National Guard of a State that fails to comply with federal requirements. Congress has specifically called for application of this provision of law in the event of violation of Section 672(f) of Title 10, United States Code.

I bring this matter to your attention because of your continuing interest in National Guard training in Central America.

The stipulation sets forth the following additional facts:

5. The [NGB] intends to order the 65th [PAD], Massachusetts, in its federal status as National Guard of the United States, a ready reserve component of the United States Army, into active duty on May 28, 1988 through June 11, 1988, pursuant to 10 U.S.C. § 672(b) or (d). This active duty is intended for training.

6. As stated in the complaint, Governor Dukakis objects and would withhold consent to the above active duty, but for the operation of 10 U.S.C. § 672(f). As stated in the complaint, Governor Dukakis objects to the location, purpose, schedule and type of this training.

7. As stated in the complaint, Governor Dukakis intends to comply with 10 U.S.C. § 672(f) until it has been declared unconstitutional or otherwise stayed. As stated in the complaint, but for 10 U.S.C. § 672(f), Governor Dukakis would not permit the members of the National Guard of the United States, who are also members of the Massachusetts National Guard, including the 65th [PAD], to be ordered to active duty in Central America at this time.

8. In the event that members of other units of the National Guard of the United States, who are also members of the Massachusetts National Guard, are ordered to active duty in Central America, the Governor, as stated in the complaint, intends to object to such training if he objects to the location, purpose, type or schedule of the training. As stated in the complaint, with regard to future assignments, Governor Dukakis intends to comply with 10 U.S.C. § 672(f) until that section has been stayed or declared unconstitutional.

## II. Constitutional and Statutory Provisions

The following constitutional provisions are at issue in this case:

The Congress shall have Power . . .

To raise and support Armies . . .;

U.S. Const. art. I, § 8, cl. 12 ("the Armies Clause").

To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions;

To provide for organizing, arming, and disciplining, the Militia, and for governing such Part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress;

U.S. Const. art. I, § 8, cls. 15, 16 (referred to jointly as "the Militia Clause").

The following statutory provisions concern the active duty of units or members of

the National Guard of the United States ("NGUS"):

> § 672. Reserve components generally
>
> (b) At any time, an authority designated by the Secretary concerned may, without the consent of the persons affected, order any unit, and any member not assigned to a unit organized to serve as a unit, in an active status in a reserve component under the jurisdiction of that Secretary to active duty for not more than 15 days a year. However, units and members of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor of the State. . . .
>
> (d) At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member. However, a member of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor . . . of the State. . . .

In 1985 and 1986, several governors withheld (or indicated their intention to withhold) their consent to active duty deployment of their National Guard units to Central America. In 1986, Congress responded by passing the Montgomery Amendment, which modifies sections 672(b) and (d) as follows:

> (f) The consent of a Governor described in subsections (b) and (d) may not be withheld (in whole or in part) with regard to active duty outside the United States, its territories, and its possessions, because of any objection to the location, purpose, type, or schedule of such active duty.

10 U.S.C. § 672(f).

### III. Historical Background

Under the Militia Act of 1792, virtually every able-bodied man between 18 and 45 was enrolled in the militia and required to arm himself at his own expense. This stat-ute was the only permanent legislation organizing the militia for over one hundred years. Wiener, *The Militia Clause of the Constitution*, 54 Harv.L.Rev. 181, 187 (1940) (hereinafter *"The Militia Clause"*). From the time of ratification of the Constitution through the Spanish War, the militia was incapable of adequately serving the country's needs. For example:

> When the Mexican War broke out, the militia was unavailable because of the constitutional limitations; service in Mexico was no part of repelling invasions or of suppressing insurrections. Accordingly, Congress authorized the organization of volunteers, who, being organized under the power "to raise and support Armies," were not subject to the restrictions of the militia clause. . . .

*Id.* at 190 (footnote omitted).

After the Civil War, "[t]he militia contemplated by the Act of 1792, that is, the whole body of the people, virtually ceased to exist, and the States relied more and more upon select bodies of men, trained after a fashion and without uniform supervision, who became known as National Guards." *Id.* at 191.

> During the Spanish War
>
> [t]he basic constitutional problem in 1898 was the same as during the Mexican War a half-century earlier: service in Cuba, in Puerto Rico, in the Philippines, was outside the constitutional obligation resting upon militia.

*Id.* at 192.

In 1901, President Theodore Roosevelt reported to Congress: "Our militia law is obsolete and worthless." *Id.* at 194. In 1903, Congress passed the Dick Act, which provided for an organized militia to be known as the National Guard. The new National Guard was to be federally funded and conform to regular army organization. *Id.* at 195. The House Report accompanying the Dick Act stated:

> [T]he services required of the militia can be rendered only upon the soil of the United States. . . . It was the hereditary fear of standing armies, as a menace to liberty in time of peace, which led the

framers of the Constitution to provide that the militia should always remain a militia of the States. It was never designed to be a militia of the United States, nor under the control of the President, except when called into actual service under some one of the [clause 15] contingencies.

*Id.* at n. 74.

In 1908, Congress enacted a measure providing that the organized militia should be available for service outside the territory of the United States. This act was apparently the result of a compromise between the War Department and the National Guard, whereby the National Guard "waived" the territorial limitations on its service. *Id.* at 197. In 1912, the Attorney General held that such extraterritorial use of the militia was unconstitutional. *Id.* at 198.

Congress' solution to this constitutional dilemma was the National Defense Act of 1916, which "federalized" the National Guard. *Id.* at 199. Under this statute, all members of the National Guard were required to take an oath to obey both the President and the governor of their state. This dual oath allowed the President to draft National Guard members into federal service, at which time they were considered discharged from the militia. The National Defense Act also provided for some federal control over the appointment of National Guard officers by prescribing their qualifications and providing for their federal recognition. *Id.* at 201.

In 1918, the Supreme Court decided the *Selective Draft Law Cases*, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918), in which the Court upheld Congress' power to compel military service in the face of a claim that the Militia Clause limited Congress' power to draft under the Armies Clause. This holding was reaffirmed in *Cox v. Wood*, 247 U.S. 3, 38 S.Ct. 421, 62 L.Ed. 947 (1918). *But see Maryland v. United States*, 381 U.S. 41, 46–47, 85 S.Ct. 1293, 1297, 14 L.Ed.2d 205 (1965) (indicating that 1916 "federalization" of National Guard was accomplished pursuant to Congress' Militia Clause power), *vacated on rehear-*

*ing*, 382 U.S. 159, 86 S.Ct. 305, 15 L.Ed.2d 227 (1965).

In 1933, Congress made the National Guard a permanent part of the Army by creating a "dual-enlistment" system.

It did this by conferring a new status on the Guard, by constituting it a reserve component of the Army, to be known as the National Guard of the United States. In its militia capacity, the National Guard was organized and administered under the militia clause of the Constitution, and available only for limited duties.... The National Guard of the United States, in its capacity as a reserve component of the Army, was organized and was to be administered under the army clause.

In place of the former draft into federal service, as individuals, the Guard would be *ordered* into federal service as units.... Upon being relieved from federal service, all individuals and units would revert to their National Guard status....

Accordingly, the National Guard has today a dual status, and every Guardsman is a reservist as well as a militiaman.

*The Militia Clause* at 208 (footnotes omitted).

It has been stated that the 1933 Act "placed the final mark of inadequacy on the militia clause. For the 1933 Act proved conclusively that a well-regulated militia is impossible of attainment under the militia clause, and can be organized only by resort to the plenary and untrammelled powers under the army clause." *Id.* at 209.

IV.  The Constitutionality of the Montgomery Amendment

At issue in this case is the constitutional status of the modern National Guard. Does Congress have power under the Armies Clause to order members of the National Guard into active duty under sections 672(b) and (d) for purposes arguably inconsistent with the Militia Clause—specifically, to train outside the United States without state consent?

Plaintiffs argue that members of the National Guard never cease to be members of the "militia" and, therefore, are always subject to the limitations of the Militia Clause. Defendants argue that National Guard members ordered into active duty under sections 672(b) and (d) are acting pursuant to Congress' broad army power, unconstrained by the Militia Clause. It is plaintiffs' contention that the reservation of power to the states, expressed in the Militia Clause, limits congressional power under the Armies Clause as well. Otherwise, plaintiffs argue, the clause purportedly reserving power to the states would be meaningless. Congress could simply bypass the reservation of power to the states over training the militia by calling the militia to active duty under the Armies Clause, which contains no comparable limitation on congressional power.

The rationale of plaintiffs' contention sweeps very broadly. The only purposes for which Congress is authorized by clause 15 to call forth the militia are "to execute the Laws of the Union, suppress Insurrections and repel Invasions." Thus, unless clause 16 is given meaning beyond that given to clause 15, under plaintiffs' rationale the scheduled training mission to Central America is unconstitutional with or without the consent of Governor Dukakis. This is so because such a foreign mission can in no way be characterized as necessary and proper for carrying out any of the powers granted in clause 15.

In view of these explicit and implicit premises of plaintiffs' arguments, the rationale of plaintiffs' challenge to the constitutionality of section 672(f) must be understood as applying not merely to an order for two weeks of training outside the United States but also to the entire system that is commonly referred to as "dual enlistment." *See* plaintiffs' Substitute Memorandum in Support of Complaint for Declaratory and Injunctive Relief (Docket No. 18) at 33–34 (arguing that clauses 15 and 16 become "dead letters" if dual-enlistment theory accepted). *But see id.* at 30 n. 18 ("This case does not present the question of the dual enlistment concept in contexts (other than training), where no express reservation of state authority exists.").

As explained in Part III above, "dual enlistment" was created by legislation enacted in 1933. That legislation authorizes simultaneous enlistment in the National Guard of a state and in a unit of the United States Army. For example, as occurred in this case according to the Stipulation of the parties, one may enlist in both "the 65th [PAD], Massachusetts" and "the National Guard of the United States, a ready reserve component of the United States Army." Stipulation, para. 5. In sustaining "dual enlistment" legislation against constitutional challenge, the Fifth Circuit declared that "[t]he express purpose of the dual enlistment concept was to avoid the limitations of the militia clause and to organize the National Guard under the broader power to raise and support armies." *Johnson v. Powell*, 414 F.2d 1060, 1063 (5th Cir.1969).

In *Johnson*, the Fifth Circuit refused to release members of the Kentucky National Guard from active duty in Vietnam even though "[t]he Vietnam conflict involves none of [the] three situations [listed in the Militia Clause]." *Id.* The court concluded that "the dual enlistment system was a proper exercise of power necessary and proper to the raising and supporting of armies." *Id.* at 1064. The court cited the *Selective Draft Law Cases* and *Cox v. Wood* for the principle that the "power [under the Armies Clause] is not limited to the conditions of service set forth in the militia clause." *Id.* at 1063.

Similarly, in *Drifka v. Brainard*, 294 F.Supp. 425 (W.D.Wash.1968), the court endorsed the dual-enlistment concept and rejected plaintiffs' contention that, as members of a state militia, they could be called forth by Congress only for the three purposes set forth in the Militia Clause. *But see Johnson v. Powell*, 393 U.S. 920, 89 S.Ct. 250, 21 L.Ed.2d 255 (Douglas, Circuit Justice 1968) (finding issue of National Guard deployment to Vietnam moot but stating that contention that National Guard members were being deployed "not as members of the 'militia' but as members of

the Ready Reserve" "might in time prevail, but it is not free of doubt; and I am not yet persuaded that either the Army or the Solicitor General can play loosely with the concept of 'militia' as used in the Constitution"); *United States v. Peel*, 4 M.J. 28, 29 (C.M.A.1977) (stating gubernatorial consent provision of section 672(d) has "constitutional foundation" and state authorities have "sole *constitutional* and statutory authority to order a national guardsman to active duty") (emphasis added).

■ Under the dual-enlistment rationale, upheld as constitutional by the *Johnson* and *Drifka* courts, the states' authority over training of the militia, reserved in the Militia Clause, does not apply to the period during which members of the militia are on active duty as part of the NGUS. *See Perpich v. United States Department of Defense*, 666 F.Supp. 1319, 1323–24 (D.Minn.1987) (part of rationale for decision of case like the case at bar), *appeal pending*, No. 87–5345–MN. It may be debated whether this substantive outcome should be described as (a) one under which the Militia Clause does not apply because the persons serving are not "members of the militia" while on active duty as part of the NGUS, or instead (b) one under which at all times they have a dual status, governed in part by the Militia Clause and in part by the Armies Clause. The *Johnson*, *Drifka*, and *Perpich* decisions are precedents for the outcome stated at the beginning of this paragraph, regardless of the way one may choose to describe it.

■ Counsel for defendants conceded at oral argument that this conception of the dual-enlistment system makes the militia dependent upon Congress for its existence because, in a practical sense at least, the militia exists only when Congress does not want or need it as part of the Army. Under such a dual-enlistment concept, pushed to the logical limit, Congress could at any time order the entire militia into active duty year-round, thus abolishing the militia and leaving the Militia Clause without practical application. A plain reading of the Constitution supports plaintiffs' contention that Congress cannot "abolish" the militia by transforming it into part of the Army. *See* U.S. Const. amend. II ("A well regulated Militia, being necessary to the security of a free State...."); Militia Clause, *supra* ("reserving to the states respectively ... the Authority of training the Militia according to the discipline prescribed by Congress"). Nevertheless, *Johnson*, *Drifka*, and *Perpich* make it clear that Congress is not violating the Militia Clause each time it authorizes members of the militia to serve as NGUS members on active duty, even though this could be characterized as a temporary transformation of the militia into a unit of the Army.

Essentially the same point is stated in the observation that, under the rationale of *Selective Draft Law Cases*, as ordinarily understood, Congress might achieve the same result (characterized as "abolishing" the militia) without a dual-enlistment system, simply by drafting all persons (whether or not members of the militia) into the Army as individuals.

The spectre of pressing the dual-enlistment rationale to its logical limit is matched by the counterpoint that if the Militia Clause is interpreted as limiting Congress' power to order the militia to active duty as part of the Army, then the Armies Clause would be without practical application because the states could enlist all citizens in the organized militia and thereby "abolish" the Army.

More important than this clash of point and counterpoint about "abolishing" either the Army or the militia is the Supreme Court's explanation of why its result in *Selective Draft Law Cases* is consistent with the framers' intent. In speaking to the interrelationship between the Armies Clause and the Militia Clause, the court explained that the framers of the Constitution delegated all governmental power over raising armies to Congress.

But the duty of exerting the power thus conferred in all its plenitude was not made at once obligatory but was wisely left to depend upon the discretion of Congress as to the arising of the exigencies which would call it in part or in whole into play. There was left therefore un-

der the sway of the States undelegated the control of the militia *to the extent that such control was not taken away by the exercise by Congress of its power to raise armies.* This did not diminish the military power or curb the full potentiality of the right to exert it but left an area of authority requiring to be provided for (the militia area) *unless and until by the exertion of the military power of Congress that area had been circumscribed or totally disappeared.* This, therefore, is what was dealt with by the militia provision. It diminished the occasion for the exertion by Congress of its military power beyond the strict necessities for its exercise by giving the power to Congress to direct the organization and training of the militia (evidently to prepare such militia in the event of the exercise of the army power) although leaving the carrying out of such command to the States.

*Selective Draft Law Cases,* 245 U.S. at 382–83, 38 S.Ct. at 163 (emphasis added).

With respect to the limited congressional uses of the militia outlined in clause 15, the Court reasoned that such a provision

thus again obviat[ed] the necessity for exercising the army power to the extent of being ready for every conceivable contingency.... But because under the express regulations the power was given to call for specified purposes without exerting the army power, it cannot follow that the latter power when exerted was not *complete to the extent of its exertion and dominant.*

*Id.* at 383, 38 S.Ct. at 163 (emphasis added).

The Court has made clear, therefore, that Congress' power to raise armies is "susceptible of narrowing the area over which the militia clause operate[s]." *Id.* at 384, 38 S.Ct. at 163. The Court in *Cox v. Wood,* 247 U.S. 3, 38 S.Ct. 421, 62 L.Ed. 947 (1918), reaffirmed the *Selective Draft Law Cases,* summarizing what was held in that decision as follows:

[T]he authority in the exercise of the war power to raise armies and use them when raised was not subject to limitations as to use of the militia, if any,

deduced from the militia clause.... [T]he power to call for military duty under the authority to declare war and raise armies and the duty of the citizen to serve when called ... knew no limit deduced from a *separate, and for the purpose of the war power, wholly incidental, if not irrelevant and subordinate, provision concerning the militia,* found in the Constitution.

*Id.* at 6, 38 S.Ct. at 422 (emphasis added).

For the purpose of deciding the precise issue now before this court, one need not read the Court's opinion in *Selective Draft Law Cases* as a sweeping declaration that Congress is authorized, in all circumstances, by the Armies Clause to abolish the militia and thus bypass the reservation of power to the states in the Militia Clause. *Selective Draft Law Cases* arose in a context of national mobilization for war. The present controversy presents the issue of accommodation between the Armies Clause and the Militia Clause in a context less compelling than that of *Selective Draft Law Cases* for priority of the Armies Clause. Nevertheless, guided by the decisions in the dual-enlistment cases as well as *Selective Draft Law Cases,* I conclude that the reservation of power to the states over "the Authority of training the Militia according to the discipline prescribed by Congress," expressed in the Militia Clause, does not override the legitimately exercised power of Congress "[t]o raise and support Armies."

Therefore, even if plaintiffs' challenge is read narrowly, as acknowledging Congress' power, in certain circumstances, to treat the National Guard in a manner that is inconsistent with the Militia Clause, and challenging only Congress' power to control the peacetime training of the National Guard, that position must fail.

To read the reservation in the Militia Clause as precluding, without consent of the respective states, all temporary calls to active duty in the Army where the motivation for the call is to provide training, would be to reach a rather extraordinary accommodation between the two separate clauses of the Constitution. Calls of militia

units to temporary active duty in the Army would be allowable for other purposes legitimately perceived by Congress to be within the scope of those national interests for the protection of which the Armies Clause was drafted by the framers, but training to prepare units called to such active duty would be suspended during the period of active duty in the Army, or conducted, if at all, only under the auspices and direction of the respective states. A court should reject any proposed interpretation of a text that attributes to it a meaning so unlikely to have been intended by those whose manifested meaning is controlling—in this instance, the framers. Thus, even if *Selective Draft Law Cases* is not to be read as holding that the Militia Clause *never* in any circumstances limits Congress' power under the Armies Clause to call militia units to active duty, still I conclude that the Militia Clause reservation of power to the states over training does not apply to the circumstances presented by this case.

One more point—implicit in all that has been said above—is best made explicit. In general, disputes are to be resolved through political processes (rather than in courts) where in essence they are disputes as to whether particular calls of units of the militia to temporary active duty, and the locations to which units are sent during such a period, do or do not serve national interests. Absent proof that a body to whom the responsibility and power for deciding such disputes has exceeded constitutional bounds in some way, courts cannot properly intrude. The record before this court falls short of presenting a case in which judicial intrusion would be appropriate.

In conclusion, the fact that, under the Supreme Court's rationale in *Selective Draft Law Cases,* the dual-enlistment system in some sense makes the militia dependent upon Congress for its existence does not render that system unconstitutional. The Militia Clause retains meaning and purpose both (a) as it limits congressional power over the militia when it is not on active duty as a part of the army and (b) as

it enables Congress to exercise more sparingly its broad army power. This blend of limiting and enabling functions serves the framers' intent that Congress have the power to provide for defense of the nation while maintaining only a small standing army. The Montgomery Amendment is a valid exercise of Congress' power under the Armies Clause and does not violate the Militia Clause.

Final judgment for defendants will be entered forthwith.