880 F.2d 11
 58 USLW 2030
 Rudy PERPICH, Governor of the State of Minnesota; State of
Minnesota, by its Attorney General Hubert H.
Humphrey, III, Appellants,
v.
UNITED STATES DEPARTMENT OF DEFENSE, United States
Department of Air Force, United States Department of Army,
National Guard Bureau, Caspar W. Weinberger, Secretary of
Defense; John O. Marsh, Jr., Secretary of the Army; Edward
C. Aldridge, Secretary of the Air Force; Lt. Gen. Herbert
R. Temple, Jr., National Guard Bureau, Appellees.
Commonwealth of Massachusetts, Amicus Curiae,
U.S. National Guard Assn., Amicus Curiae.
 No. 87-5345.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Feb. 16, 1989.
Decided June 28, 1989.
 
 John R. Tunheim, St. Paul, Minn., for appellants.
 John Bolton, Bethesda, Md., for appellees.
 Before McMILLIAN, Circuit Judge, HEANEY, Senior Circuit Judge, and ARNOLD, JOHN R. GIBSON, FAGG, BOWMAN, WOLLMAN, MAGILL and BEAM, Circuit Judges, EN BANC.*
 MAGILL, Circuit Judge.
 
 
 1
 In this opinion, we address a challenge to the constitutionality of the Montgomery Amendment, which restricts the power of state governors to withhold consent to federal deployment of the National Guard of the United States. We hold that the Constitution does not require gubernatorial consent to active duty for training of the National Guard of the United States. Based on the statutory system of dual enlistment and the relationship between the Constitution's army and militia clauses, we find the Montgomery Amendment to be a constitutional exercise of congressional power.
 
 I.
 
 2
 In 1985 and 1986, several governors objected to deployment of National Guard personnel to Central America. The governors withheld (or threatened to withhold) their consent to federally ordered active duty missions by their States' National Guards. 10 U.S.C. Sec. 672(b), (d) (1982).[1] In response, Congress enacted the Montgomery Amendment, which prohibits the governors from withholding consent to active duty outside the United States because of objections to the location, purpose, type, or schedule of active duty. Id. Sec. 672(f) (Supp. IV 1986).[2]
 
 
 3
 Members of the Minnesota National Guard participated in three active duty training missions in Central America in January 1987. After the Guard returned, Governor Rudy Perpich, the Commander in Chief of the State's military forces, objected to defendants' ordering the Guard to active duty for training in Honduras.[3] Because Perpich wanted to withhold consent to further orders, the Governor and the State of Minnesota filed this suit. Perpich sought a declaration of the governors' constitutional authority to withhold consent to peacetime training of the Guard outside of the United States. Perpich asked specifically for a declaration that the Montgomery Amendment infringes "the Authority of training the Militia" reserved to the States by the Constitution. U.S. Const. art. 1, Sec. 8, cl. 16. Perpich also sought to enjoin any federal order commanding members of the Minnesota unit of the National Guard to active duty for training outside of the United States without Perpich's consent.
 
 
 4
 The district court,[4] in a well-reasoned opinion, held that the dual enlistment system, under which Guard members enlist and serve in both the state National Guard and the federal National Guard of the United States, was a necessary and proper exercise of Congress' power to raise and support armies. Perpich v. United States Department of Defense, 666 F.Supp. 1319, 1323 (D.Minn.1987). The court also held that the States' authority to train the militia did not inhibit Congress' power to provide for active duty training of the National Guard of the United States without the governors' consent. Perpich, 666 F.Supp. at 1325; accord Dukakis v. United States Department of Defense, 686 F.Supp. 30, 38 (D.Mass.), aff'd, 859 F.2d 1066 (1st Cir.1988) (per curiam), cert. denied, --- U.S. ----, 109 S.Ct. 1743, 104 L.Ed.2d 181 (1989). The court granted summary judgment to defendants, and Perpich appealed.
 
 
 5
 A divided panel of this court reversed, holding that the Montgomery Amendment violated the constitutional reservation of state authority to train the Militia, and that National Guard personnel could not be ordered to active duty for training without the consent of the States unless the Congress or the President first declared a national security emergency or exigency. Perpich v. United States Department of Defense, No. 87-5345, slip op. (8th Cir. Dec. 6, 1988). On January 11, 1989, this court granted rehearing en banc, thus vacating the opinion of the panel. We now affirm the judgment of the district court upholding the constitutionality of the Montgomery Amendment.
 
 II.
 
 6
 This case involves conflicting assertions of sovereignty by the state and national governments. Perpich[5] claims the constitutional authority to withhold consent for National Guard training outside the United States in peacetime. The Department of Defense contends that, when Congress acts under its constitutional power to raise and support armies, it may authorize active duty to train reserve forces without infringing the States' authority over militia training. The Department of Defense also contends that a governor's decision to withhold consent based on objections to the location or purpose of Guard training would infringe the national government's exclusive authority to conduct the national defense.
 
 
 7
 Today, the militia (with a number of exceptions of no importance here) consists of all able-bodied male citizens ages 17 to 45 and of female citizens who are commissioned officers of the National Guard. 10 U.S.C. Sec. 311(a). The militia is divided into two classes, the organized militia and the unorganized militia. Id. Sec. 311(b). The National Guard is the organized militia of the several States. Id. Sec. 101(10), (12).[6] The National Guard of the United States (NGUS) consists of the members of the National Guard or organized militia who are also enlisted in a reserve component of the United States Army or Air Force. Id. Sec. 261.[7]
 
 
 8
 In 1933, Congress established the National Guard of the United States as a component of the Army of the United States. Act of June 15, 1933, ch. 87, Sec. 5, 48 Stat. 155. The National Guard of the United States consisted of the federally recognized members and units of the National Guard of the several States. Id. The 1933 Act created a dual enlistment system, id., Secs. 7-11, 48 Stat. 156-57, whereby "an incoming guardsman joined both the National Guard of his home state and the National Guard of the United States, a reserve component of the U.S. Army." Johnson v. Powell, 414 F.2d 1060, 1063 (5th Cir.1969). The President was authorized to order any or all units or members of the National Guard of the United States into active military service, if Congress first declared a national emergency and authorized the use of armed land forces in excess of the number of regular troops. Act of June 15, 1933, ch. 87, Sec. 18, 48 Stat. 160. In establishing the National Guard of the United States, Congress invoked its army clause powers. H.R.Rep. No. 141, 73d Cong., 1st Sess. 3-4 (1933); see generally Weiner, The Militia Clause of the Constitution, 54 Harv.L.Rev. 181, 187 (1940).
 
 
 9
 In 1952, Congress enacted the legislative forerunners of 10 U.S.C. Sec. 672(b) and (d) as part of a comprehensive strengthening of the armed forces' reserve components. Armed Forces Reserve Act of 1952, ch. 608, Sec. 233(c), (d), 66 Stat. 481, 490. See S.Rep. No. 1795, 82d Cong., 2d Sess. (1952), reprinted in 1952 U.S.Code Cong. & Admin.News 2005. The Army National Guard of the United States and the Air National Guard of the United States were designated as reserve components in the Ready Reserve of the Army and Air Force, respectively. Armed Forces Reserve Act of 1952, Secs. 202, 208(c), 66 Stat. at 483-84.
 
 
 10
 Today, Congress authorizes active reserve duty for the National Guard of the United States in a variety of circumstances.[8] The Army and Air National Guard of the United States, established and maintained under Congress' army power, function as reserves in the United States Army and Air Force "to provide trained units and qualified persons available for active duty in the armed forces, in time of war or national emergency and at such other times as the national security requires." 10 U.S.C. Sec. 262.
 
 
 11
 Under the "Total Force" structuring of American military forces, reserve components, including the National Guard of the United States, are fully integrated with regular active forces in the national defense. See H.R.Rep. No. 1069, 94th Cong., 2d Sess. 325, reprinted in 1976 U.S.Code Cong. & Admin.News 1034, H.R.Rep. No. 107, 98th Cong., 1st Sess. 202 (1983). For example, the Army National Guard of the United States provides forty-six percent of the combat units and twenty-eight percent of the support forces of the total Army. The Army National Guard of the United States would provide eighteen of the twenty-eight army divisions, wholly or in part, in the event of full mobilization. The Air National Guard of the United States provides seventy-three percent of air defense interceptor forces, fifty-two percent of tactical air reconnaissance, thirty-four percent of tactical air lift, twenty-five percent of tactical fighters, seventeen percent of aerial refueling, twenty-four percent of tactical air support, and other forces. Supp.Jt.App. at 5 (reprinting Hearings On Federal Authority Over National Guard Training Before the Subcommittee on Manpower and Personnel of the Senate Committee on Armed Service, 99th Cong., 2d Sess. (1986) (testimony of James H. Webb, Jr.)).
 
 
 12
 Article 1, section 8, clause 12 gives Congress the power "to raise and support Armies * * *." Clause 16 "reserv[es] to the States respectively the Authority of Training the Militia according to the discipline prescribed by Congress." Minnesota asserts its sovereignty over the organized militia, legally constituted as the Minnesota Units of the Army and Air National Guards. Defendants assert their authority over enlisted members of the National Guard of the United States. We consider whether Congress' qualification of the governor's consent provisions in section 672 infringes the States' "Authority of training the Militia according to the discipline prescribed by Congress." The issue, simply put, is this: when the State claims a right to control Militia training, and Congress claims 'We're training the Army, not the Militia,' who wins?
 
 
 13
 The authority given to Congress by the army clause is plenary and exclusive. Tarble's Case, 80 U.S. (13 Wall.) 397, 408, 20 L.Ed. 597 (1872). In the Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918), the Court observed that "complete authority" over the "army sphere" was "conferred in all its plenitude" to Congress, with the exertion of that power "wisely left to depend upon the discretion of Congress as to the arising of the exigencies which would call it in part or in whole into play." 245 U.S. at 382-83, 38 S.Ct. at 163. More recently, the Court has observed that "the constitutional power of Congress to raise and support armies and to make all laws necessary and proper to that end is broad and sweeping." United States v. O'Brien, 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968).
 
 
 14
 The dual enlistment system, under which Guard members enlist and serve in both a state National Guard and the federal National Guard of the United States, is a necessary and proper exercise of Congress' army power. Perpich, 666 F.Supp. at 1323. See also Dukakis v. United States Department of Defense, 686 F.Supp. 30 (D.Mass.), aff'd, 859 F.2d 1066 (1st Cir.1988) (per curiam); Johnson v. Powell, 414 F.2d 1060, 1063 (5th Cir.1969); Drifka v. Brainard, 294 F.Supp. 425 (W.D.Wa.1968). Congress' establishment of the ready reserve and authorization of active duty, for training or otherwise, also falls within the lawful scope of the army power, as an exercise of congressional discretion in prescribing the exigencies of military training and discipline. See Chappell v. Wallace, 462 U.S. 296, 300, 103 S.Ct. 2362, 2365-66, 76 L.Ed.2d 586 (1983).
 
 
 15
 Here Guard units were ordered into federal service for training in Central America in their role as the National Guard of the United States, a ready reserve component of the United States Army. The statutes authorizing this federal action are statutes grounded upon the army clause. These actions are beyond the reach of the militia clause.
 
 
 16
 While we could well conclude at this point, the vigorous argument of Perpich makes it proper that we further consider the scope of the militia clause.
 
 III.
 
 17
 In the Selective Draft Law Cases, the Supreme Court upheld Congress' authority to draft individuals into the United States Armed Services, notwithstanding their status as National Guard members already in the service of the United States. The Court held that Congress' power to conscript for the army under its authority to raise and support armies and to declare war was not confined to the express provisions for calling forth the militia. The Court reasoned that the one delegation of power to Congress (to call forth the militia) did not circumscribe the operation of another delegated power (to raise armies). 245 U.S. at 384, 38 S.Ct. at 163.
 
 
 18
 Thus, the Supreme Court has made clear that the army clause is not limited by the militia clause:
 
 
 19
 There was left therefore under the sway of the States undelegated the control of the militia to the extent that such control was not taken away by the exercise by Congress of its power to raise armies. This did not diminish the military power or curb the full potentiality of the right to exert it but left an area of authority requiring to be provided for (the militia area) unless and until by the exertion of the military power of Congress that area had been circumscribed or totally disappeared. This, therefore, is what was dealt with by the militia provision. * * * But because under the express regulations the power was given to call [the Militia] for specified purposes without exerting the army power, it cannot follow that the latter power when exerted was not complete to the extent of its exertion and dominant. Because the power of Congress to raise armies was not required to be exerted to its full limit but only as in the discretion of Congress it was deemed the public interest required, furnishes no ground for supposing that the complete power was lost by its partial exertion. Because, moreover, the power granted to Congress to raise armies in its potentiality was susceptible of narrowing the area over which the militia clause operated, affords no ground for confounding the two areas which were distinct and separate to the end of confusing both the powers and thus weakening or destroying both.
 
 
 20
 245 U.S. at 383-84, 38 S.Ct. at 163. Cox v. Wood, 247 U.S. 3, 6, 38 S.Ct. 421, 421-22, 62 L.Ed. 947 (1918), further explained the relationship between the two clauses:
 
 
 21
 [T]he constitutional power of Congress to compel the military service which the assailed law commanded was based on the following propositions: (a) That the power of Congress to compel military service and the duty of the citizen to render it when called for were derived from the authority given to Congress by the Constitution to declare war and to raise armies. (b) That those powers were not qualified or restricted by the provisions of the militia clause, and hence the authority in the exercise of the war power to raise armies and use them when raised was not subject to limitations as to use of the militia, if any, deduced from the militia clause. And (c) that from these principles it also follows that the power to call for military duty under the authority to declare war and raise armies and the duty of the citizen to serve when called were coterminous with the constitutional grant from which the authority was derived and knew no limit deduced from a separate, and for the purpose of the war power, wholly incidental, if not irrelevant and subordinate, provision concerning the militia, found in the Constitution.
 
 
 22
 Looking particularly to the Selective Draft Law Cases, the district court here, as well as that in Dukakis, concluded that the states' authority reserved in the militia clause does not apply to the period during which members are on active duty as a part of the National Guard of the United States. The Dukakis court made it clear that it did not read the Selective Draft Law Cases as a sweeping declaration that Congress is, in all circumstances, authorized by the army clause to bypass the reservation of power to the states in the militia clause. Faced with circumstances identical to those here, however, Dukakis held:
 
 
 23
 Nevertheless, guided by the decisions in the dual-enlistment cases as well as Selective Draft Law Cases, I conclude that the reservation of power to the states over "the Authority of training the Militia according to the discipline prescribed by Congress," expressed in the Militia Clause, does not override the legitimately exercised power of Congress "[t]o raise and support Armies."
 
 
 24
 686 F.Supp. at 37. As in Dukakis, the district court in Perpich held that the dual enlistment system is a valid exercise of congressional power under the army clause and the necessary and proper clause. Because the authority to provide for national defense is plenary, the militia clause cannot constrain Congress' authority to train the Guard as it sees fit when the Guard is operating pursuant to the army clause. Perpich v. United States Dep't of Defense, 666 F.Supp. 1319, 1323-24 (D.Minn.1987). As the militia clause does not limit Congress' authority to train the National Guard of the United States while it is in active service, the gubernatorial veto is not constitutionally required. Id. at 1324. We are satisfied that the district court was correct in this holding.
 
 
 25
 Congress' army power is plenary and exclusive. The reservation to the States of authority to train the Militia does not conflict with Congress' authority to raise armies for the common defense and to control the training of federal reserve forces. The Montgomery Amendment is a constitutional exercise of Congress' army powers.
 
 
 26
 The judgment of the district court is affirmed.
 
 
 27
 HEANEY, Senior Circuit Judge, with whom McMILLIAN, Circuit Judge, joins, dissenting.
 
 I. Introduction
 
 28
 With a few strokes of the word processor, the majority has written the Militia Clause out of the United States Constitution. In so doing, it contradicts the clear intent of the founding fathers, who believed that state control over elements of the military was essential to a free and peaceful republic. To this end, they gave the states a degree of power over the militia, which they intended to be a significant element of our national defense. The majority ignores the unambiguous language of the Constitution, and disregards the historical construction given to the Militia Clause and the Army Clause by the three branches of the federal government and the states. The plain and unassailable fact is that, until Congress tacked the Montgomery Amendment on to a defense appropriations bill, it was not responsibly asserted that Congress had the power under the Constitution to require the National Guard to participate in peacetime training missions without the consent of the governor of the affected state.
 
 
 29
 The majority relies on the Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349 (1918), for the proposition that the Militia Clause imposes no limits on the power of Congress to declare war and raise armies. It neglects to note, however, that in those cases the Supreme Court merely held that Congress could require compulsory military service during wartime. The Supreme Court neither held nor suggested in that or any other case that Congress could require the National Guard to engage in training missions during peacetime without gubernatorial consent.
 
 
 30
 The majority places great reliance on the 1933 amendments to the National Defense Act. In that legislation, Congress determined that the Army of the United States would consist of the regular Army, the National Guard of the United States, the state National Guard while in the service of the United States, the Officer Reserve Corps, the organized Reserve and the enlisted Reserves. It adopted the amendments to alleviate the necessity of drafting individual members of the National Guard into the army by allowing them to be called into service in whole units in the "event of war or other national emergency so declared by Congress." The act states in section 111 that:
 
 
 31
 When Congress shall have declared a national emergency and shall have authorized the use of armed land forces * * * the President may * * * order into the active military service of the United States, to serve therein for the period of the war or emergency, * * * any or all units and the members thereof of the National Guard of the United States.
 
 
 32
 48 Stat. at 160. In the absence of war or national emergency, Congress left state control over the militia intact.
 
 
 33
 The majority's final argument is that the requirements of the modern Army are such that the Defense Department must have absolute power to order the National Guard to participate in peacetime training without gubernatorial consent. This assertion is not supported by any facts. To the contrary, the record shows that the efficiency of the National Guard has not been affected at all by the refusal of one or more governors to consent to a particular mission. Moreover, if in the future there is a danger that non-consent would affect our national security, a national emergency may be declared, as President Reagan did during the recent raid on Libya. See Exec.Order No. 12,543, reprinted in Dept.St.Bull. 37-38 (March 1986). This is a small price to pay for compliance with the Constitution.
 
 
 34
 I initially turn to the intent of the framers.
 
 II. The Intent of the Framers
 A. The Militia Clauses
 
 35
 The military power of the United States is based on a system of checks and balances. The Framers divided authority over the military, not only between the coordinate branches of the federal government, but also between the federal and state governments.
 
 
 36
 The latter division is emphasized in several ways. First, because of the Framers' fear that a large standing army would lead to military abuses by the federal government, state militias were intended to comprise the bulk of the nation's defensive force. Second, control over these militias was explicitly shared between the federal government and the states. (The states were to appoint the militia's officers and to control the actual training of militiamen.) Third, while the Framers did not want the states to make positive national policy in the areas of defense or foreign relations matters,[1] they did intend the states to use their control over the militia to prevent the federal government, except in circumstances where national security was threatened, from using state troops in military undertakings objectionable to the states and their citizenry.
 
 
 37
 Under the Articles of Confederation, the states were required to "keep up a well regulated and disciplined militia * * *." U.S. Arts. of Confed. art. VI. The central government had the power to declare war and the supervisory authority to order the states to produce quotas of armed and trained troops. Id., art. IX. This system proved unworkable. The states had too much independent power to resist the requests of the central government. The troops provided were often inadequately trained and equipped and thus difficult to coordinate into a cohesive and effective force.
 
 
 38
 Thus, as the delegates assembled during the summer of 1787 to draft a more viable instrument of government, a pressing objective was the creation of a stronger, more reliable armed force. This aim was widely shared. The effort to find a specific solution, however, proved extremely divisive. From the outset, it was agreed that the problem would not be solved by the creation of a large, federally controlled standing army. The Framers identified such a force with British tyranny, potential oppression of states and individual citizens, and expensive, unpopular military adventures.[2] Thus, while the Framers would ultimately provide for a standing army, they would limit its power by declaring that military appropriations had to be approved every two years. U.S. Const. art. I, Sec. 8, cl. 12. More importantly, for the purposes of this discussion, the Framers stated their intent to have state militias provide for the nation's basic defense, with reliance on a standing army only as a last resort.[3]
 
 
 39
 As a corollary to the decision to rely largely on the militia for the nation's defense, it was believed necessary to provide a degree of federal control over these forces in order to achieve military effectiveness. The Convention rapidly agreed that the state militias would be placed under the control of the federal government in emergency situations, such as when insurrection or invasion was threatened, or when the militias were needed to enforce the laws of the country. See U.S. Const. art. I, Sec. 8, cl. 15 (Clause 15) ("Congress shall have the power * * * [t]o provide for calling forth the Militia to execute the laws of the Union, suppress Insurrections and repel Invasions * * *.").[4] However, in other cases, the degree of control the federal government would exercise over state militias was a point of contention.
 
 
 40
 Nationalist delegates believed in strong federal control of the state militias in order to create a dependable, coordinated defensive force.[5] States-rights delegates profoundly opposed such federal power.[6] These delegates voiced fears that powerful federal authority over the state militias would, like the existence of a large standing army, lead to military abuses by the new government. They particularly feared that such authority would allow the federal government to tyrannize defenseless individual states and their citizens[7] and could leave the states without the means to meet their own public needs.[8]
 
 
 41
 The debate between these factions was vigorous, for neither extreme had sufficient support at the Convention for its position to prevail.[9] After several months of discussion and many days of hard-fought exchange on the floor of the Convention, delegates, such as George Mason, began to seek a compromise which would provide the federal government with sufficient control over the militia to meet its defensive needs, while at the same time assuring the states sufficient authority to check the potential abuse of military power by the federal government.[10]
 
 
 42
 On August 21, 1787, the Convention was presented with a workable compromise. The new proposal provided the federal government the authority "[t]o make laws for organizing, arming, and disciplining the militia, and for governing such part of them as may be employed in the service of the U.S.," while concurrently "reserving to the States respectively the appointment of the officers, and the authority of training the militia according to the discipline prescribed by the U.States."[11] This compromise, with minor stylistic changes, was ultimately approved by the Convention. U.S. Const. art. I, Sec. 8, cl. 16 (Clause 16).
 
 
 43
 Delegate Hamilton declared that the authority to appoint officers was given to the states in order to secure for them "a preponderating influence over the militia." The Federalist No. 29, at 185 (A. Hamilton) (J. Cooke ed. 1961) (Cooke). Moreover, the debates indicated that the training clause was retained in the text of the Constitution to ensure that the power to "organize, arm, and discipline" state forces given the federal government by the Militia Clauses did not surreptitiously extend federal control over the actual training of the militia.[12]
 
 
 44
 While this compromise would ultimately win the approval of a majority of the states present at the Convention, many states-rights advocates believed that the plan still granted the federal government too much authority. A recurrent claim was that the proposed clause allowed the federal government to abuse its military power by sending citizens far from home for indefinite periods in furtherance of military schemes objectionable to the states.[13]
 
 
 45
 Supporters of the compromise, in response, assured potential opponents that the national government would only send the militia away from home in emergencies, such as when invasion or rebellion was threatened, or when there was a need to execute the laws. See The Federalist No. 29, Cooke at 187. In other situations, they asserted, the states and the people would assure that the federal government did not abuse its control of the militia. Hamilton emphasized that the militia were under the "preponderating influence" of the states. Id. at 186. Thus, he continued, "What shadow of danger can there be from men who are daily mingling with the rest of their countrymen, and who participate with them in the same feelings, sentiments, habits, and interests?" Id. Hamilton concluded that, if the federal government attempted to send state troops on such adventures, its action would be based not on authority granted in the Constitution but rather on "imagined intrenchments of power." He believed that the states and the people would not tolerate such clear violations of the law.[14]
 
 
 46
 Madison, in like manner, declared that the authority of the states "as coequal sovereigns," together with the political power of the people, would form a significant check on the potential use of state militias for military adventures by the federal government. He stated:
 
 
 47
 Can we believe that a government of a federal nature, consisting of many coequal sovereigns, and particularly having one branch chosen from among the people, would drag the militia unnecessarily to an immense distance. This, sir, would be unworthy of the most arbitrary despot. They have no temptation whatever to abuse this power; such abuse could only answer the purpose of exciting the universal indignation of the people, and drawing on themselves the general hatred and detestation of their country.
 
 
 48
 3 Elliot, supra note 2, at 381-82.
 
 
 49
 B. The Guarantee of Republican Government Clause
 
 
 50
 The Guarantee of Republican Government Clause provides:
 
 
 51
 The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence.
 
 
 52
 U.S. Const. art. IV, Sec. 4.
 
 
 53
 During the ratification debates, many of the delegates to the state conventions feared that the federal power to suppress domestic violence in individual states provided by this clause, together with the federal power over the militia set forth in Clauses 15 and 16, posed a serious threat to the states in the form of unchecked federal military power. James Madison responded forcefully to these suggestions and, in so doing, provided clear support for the principle that reserved state authority over the militia was designed as an explicit check on the potential abuse of military power by the federal government.
 
 
 54
 In the Virginia convention, Madison stated:
 
 
 55
 The authority of training the militia, and appointing the officers, is reserved to the states. Congress ought to have the power to establish a uniform discipline throughout the states, and to provide for the execution of the laws, suppress insurrections, and repel invasions: these are the only cases wherein they can interfere with the militia * * *.
 
 
 56
 3 Elliot, supra note 2, at 90 (emphasis added).
 
 
 57
 Several days later, Patrick Henry declared that Clauses 15 and 16, together with the Guarantee of Republican Government Clause, gave the federal government "unbounded control over the national strength" and "unequivocally relinquished" the states' control over their militias. Id. at 422-24. In like manner, William Grayson repeatedly argued that under the proposed Constitution, Congress could call out the militia whenever it desired and thus there was "no check" on federal control over the militia. Id. at 417-18, 421.
 
 
 58
 In response, Madison reasoned that practical necessities required dividing power over the militia between the federal government and the states. Following from this, he continued:
 
 
 59
 If [power over the militia] must be divided, let him [Henry] show a better manner of doing it than that which is in the Constitution. I cannot agree with the other honorable gentleman [Grayson], that there is no check. There is a powerful check in that paper. The state governments are to govern the militia when not called forth for general national purposes; and the Congress is to govern such part only as may be in the actual service of the Union. Nothing can be more certain and positive than this. It expressly empowers Congress to govern them when in the Service of the United States. It is, then, clear that the states govern them when they are not.
 
 
 60
 Id. at 424 (emphasis added).
 
 C. The Second Amendment
 
 61
 The second amendment to the Constitution provides:
 
 
 62
 A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.
 
 
 63
 U.S. Const. amend. II.
 
 
 64
 This amendment was intended to reassure states-rights advocates who feared that the power of a large federal standing army would diminish the "security of a free state." The second amendment guaranteed the perpetual existence of a viable militia as a continued check on the military power of the federal government. As the Supreme Court stated, "With the obvious purpose to assure the continuation and render possible the effectiveness of [the militia] the declaration and guarantee of the Second Amendment were made. [The second amendment] must be interpreted and applied with this in view." United States v. Miller, 307 U.S. at 178, 59 S.Ct. at 818 (emphasis added).[15]
 
 
 65
 D. The Framers' View of the Interplay of the Army and Militia Powers
 
 
 66
 The Constitution provides Congress with the power "To Raise and support Armies * * *," U.S. Const. art. I, Sec. 8, cl. 12, and the power "To make all Laws which shall be necessary and proper to carry into Execution [these powers] * * *." Id., cl. 18.[16]
 
 
 67
 In terms of the militia, Clause 15 provides that Congress shall have the power:
 
 
 68
 To provide for calling forth the Militia to execute the Laws of the Union, suppress Insurrections and repel Invasions * * *.
 
 
 69
 Clause 16 gives Congress the further power:
 
 
 70
 To provide for organizing, arming, and disciplining the Militia, and for governing such part of them as may be employed in the Service of the United States, reserving to the States respectively, the Appointment of the Officers, and the Authority of training the Militia according to the discipline prescribed by Congress.
 
 
 71
 Id. (emphasis added).
 
 
 72
 In The Federalist No. 23, Alexander Hamilton discussed the scope of the Constitution's Army Clause in the following terms:
 
 
 73
 The authorities essential to the care of the common defence are these--to raise armies--to build and equip fleets--to prescribe rules for the government of both--to direct their operations--to provide for their support. These powers ought to exist without limitation: Because it is impossible to foresee or define the extent and variety of national exigencies, or the correspondent extent and variety of the means which may be necessary to satisfy them. The circumstances that endanger the safety of nations are infinite; and for this reason no constitutional shackles can wisely be imposed on the power to which the care of it is committed. This power ought to be co-extensive with all the possible combinations of such circumstances; and ought to be under the direction of the same councils, which are appointed to preside over the common defense.
 
 
 74
 * * *
 
 
 75
 * * *
 
 
 76
 Whether there ought to be a Federal Government intrusted with the care of the common defence, is a question in the first instance open to discussion; but the moment it is decided in the affirmative, it will follow, that that government ought to be clothed with all the powers requisite to the complete execution of its trust. And unless it can be shown, that the circumstances which may affect the public safety are reducible within certain determinate limits; unless the contrary of this proposition can be fairly and rationally disputed, it must be admitted, as a necessary consequence, that there can be no limitation of that authority which is to provide for the defence and protection of the community, in any matter essential to its efficacy; that is, in any matter essential to the formation, direction or support of the NATIONAL FORCES.
 
 
 77
 The Federalist No. 23, Cooke at 147-48 (emphasis modified).
 
 
 78
 The government asserts, and the majority implicitly accepts the view, that this passage indicates the Framers believed the power to raise armies could supersede reserved state authority over the militia at will. I am unable to find a word in discussions leading to the adoption of the Militia Clause that supports this interpretation.
 
 
 79
 First, in this essay, Hamilton was writing of the "army power." There is no reference--of any kind--in The Federalist No. 23 to the interaction of the army power with the militia power. There is no reference to the militia or to the Militia Clauses at all. Second, when Hamilton discusses the militia power in The Federalist No. 29, he directly contradicts the interpretation the government gives The Federalist No. 23.
 
 
 80
 Strange as it may now seem, the Framers feared that if the militia did not exist to protect state interests, the army might be used by the federal government to oppress the states and their citizens.[17] Thus, Hamilton, in The Federalist No. 29 (along with Madison in The Federalist No. 46 ), declared that an essential purpose behind the states' reserved authority over the militia was to guard against the dangers of the federal army.[18]
 
 
 81
 Hamilton could not have meant that the Army Clause has the power to supersede the reserved state authority over the militia at will. If the federal government could use the army power at will to make the militia a federal force under its plenary control, then the Militia Clauses could not serve their intended purpose to protect the states against potential oppression by the federal army.
 
 
 82
 Given the basic nature of this contradiction (and the fact that The Federalist No. 23 does not even discuss the militia), it is likely that Hamilton was simply writing about the broad authority of the army power to serve the national defense, without reference to the militia power.
 
 
 83
 Alternatively, The Federalist Nos. 23 and 29 can be read together to allow the army power to supersede the militia power in more tightly confined circumstances. Hamilton, in The Federalist No. 23, speaks of the broad and unhindered sweep of the army power very clearly in the context of unforeseeable "national exigencies," or, phrased in other ways, in terms of the "circumstances that endanger the safety of nations," or "circumstances which may affect the public safety." Clearly, these phrases are significant to Hamilton, and by reading such a "national exigency" as a necessary requirement before the Army Clause can supersede state authority over the militia in peacetime, the seemingly contradictory messages of The Federalist No. 23 and The Federalist Nos. 29 and 46 are harmonized.
 
 
 84
 If the authority of the Army Clause to supersede the reservation of state authority in the Militia Clauses is limited to "national exigencies" or "circumstances that endanger the safety of the nation," federal power over the militia can only "trump" the state power when the whole union, or the national interest, is in some way threatened. If such a threat did not exist, the states would then be protected from the oppressive exercise of federal authority by the Militia Clauses.
 
 
 85
 Certain powers, such as reserved state authority over the militia, were enumerated in the Constitution in order to be insulated from uncontrolled and potentially irresponsible short-term political reaction. Such powers represented fundamental structural decisions by the Framers, based on their view of political society. They realized that, unless insulated, these powers could be eliminated in the heat of the moment by ill-considered political reactions. See The Federalist No. 10 (J. Madison).
 
 III. The Text of the Constitution
 
 86
 The plain language of Article I, Section 8, Clause 16 of the Constitution "reserv[es] to the States respectively * * * the Authority of Training the Militia * * *." This is an unambiguous command in the text of the Constitution which we cannot ignore. The second amendment to the Constitution provides that, "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms is not infringed." This amendment mandated the states to keep troops as a check on the power of the federal government as a matter of constitutional law. United States v. Miller, 307 U.S. at 178, 59 S.Ct. at 818; see also, Should I Stay or Should I Go, supra note 15 at 176, 203. When read together with Clause 16, the second amendment clearly opposes the power of Congress to raise armies at will. The clauses, however, can be readily harmonized if we accept the concept that the power of Congress over the National Guard is supreme only in times of war or a declared national emergency.
 
 IV. The Decided Cases
 A. The Supreme Court
 
 87
 The majority reads the Selective Draft Law Cases, supra, and Cox v. Wood, 247 U.S. 3, 38 S.Ct. 421, 62 L.Ed. 947 (1918), to permit, if not to require, its holding. I find no support for the majority's view in these cases.
 
 
 88
 The Selective Draft Law of May 18, 1917, ch. 15, 40 Stat. 76, was passed shortly after Congress had declared war on Germany. The act unambiguously recites that the country was faced with an "emergency, which demands the raising of troops in addition to those now available." 40 Stat. at 76.[19]
 
 
 89
 In the Selective Draft Law Cases, the Court concluded:[T]he possession of authority to enact the statute must be found in the clauses of the Constitution giving Congress power "to declare war; ... to raise and support armies, but no appropriation of money to that use shall be for a longer term than two years; ... to make rules for the government and regulation of the land and naval forces." Article I, Sec. 8. And of course the powers conferred by these provisions like all other powers given carry with them as provided by the Constitution the authority "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers." Article I, Sec. 8.
 
 
 90
 245 U.S. at 377, 38 S.Ct. at 161 (emphasis added).
 
 
 91
 The Supreme Court held that the conscription statute passed under the powers to declare war and to raise and support armies, together with all the other military powers available to the federal government, gave the federal government authority to conscript male citizens. Further, it held that this authority was not limited by the states' reserved authority over the militia. The Court's holding was succinctly summarized four months later in another opinion, on a closely related issue. Chief Justice White wrote:
 
 
 92
 [O]n the face of the opinion delivered [in the Selective Draft Law Cases ] the constitutional power of Congress to compel military service * * * was based on the following propositions: (a) That the power of Congress to compel military service and the duty of the citizen to render it when called for were derived from the authority given to Congress by the Constitution to declare war and to raise armies. (b) That those powers were not qualified or restricted by the provisions of the militia clause, and hence the authority in the exercise of the war power to raise armies and use them when raised was not subject to limitations as to use of the militia, if any, deduced from the militia clause. And (c) that from these principles it also follows that the power to call for military duty under the authority to declare war and raise armies, and the duty of the citizen to serve when called were coterminous with the constitutional grant from which the authority was derived and knew no limit deduced from a separate, and for the purpose of the war power, wholly incidental if not irrelevant and subordinate, provision concerning the militia, found in the Constitution.
 
 
 93
 Cox v. Wood, 247 U.S. at 6, 38 S.Ct. at 422 (emphasis added).
 
 
 94
 Neither of the cases supports the majority's opinion. The Court simply declared that in war the federal government can use all its military powers combined to supersede the states' reserved authority over the militia.
 
 
 95
 The Selective Draft Law Cases are also distinguishable because the conscription statute at issue drafted the members of the National Guard (militia) into the army as citizens, not as militiamen. For this reason, the government argued that the power to draft citizens in no way infringed upon the reserved rights of the states over the militia, and thus the Court did not have to reach the militia clause arguments. See Selective Draft Law Cases, 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, 352 (1918) (summary of oral argument). See also Friedman, supra note 2, at 1496 and Comment, supra note 2, at 624 & n. 157.[20]
 
 
 96
 The language in the Selective Draft Law Cases concerning the interplay of the army and militia powers begins with the Court noting that an improved understanding of the scope of these provisions can be gained by comparing the powers of the federal government before and after the Constitution was ratified. Under the Articles of Confederation, Congress had the right "to call on the states for forces." 245 U.S. at 382, 38 S.Ct. at 163. Correspondingly, the states had an inescapable duty to furnish troops when called. This "embraced the complete power of government over the subject." Id. The Court analogized this power to the authority to raise armies under the Constitution.
 
 
 97
 Following immediately on the heels of this description of "the army sphere," however, the Court explicitly cautioned that this power was not controlling over the states. Rather, its use was confined to those "exigencies" in which Congress, in its discretion, saw fit to use the power.[21]
 
 The Court stated:
 
 98
 But the duty of exerting the power thus conferred in all its plentitude was not made at once obligatory but was wisely left to depend upon the discretion of Congress as to the arising of the exigencies which would call it in part or in whole into play.
 
 
 99
 Id. at 382-83, 38 S.Ct. at 163 (emphasis added).
 
 
 100
 The Court then continued its comparison of the Articles of Confederation to the Constitution. Under the Articles, the Court declared, there was an open area of authority that, in the absence of the proper exercise of the power to raise armies, left the states with control over the militia. This control was, in the Court's view, analagous to the authority reserved to the states under the militia provisions of the Constitution.
 
 
 101
 The Court next explained that the Militia Clauses also provided further positive powers to Congress. The Court noted that Clause 15 allowed Congress to make use of the militia when insurrection or invasion was threatened and to execute the laws. Clause 16 also provided Congress with some power over the organization and training of state militias. The Court carefully declared, however, that the Militia Clause left the specific "carrying out of" (i.e., the specific authority over) the organization and training of the militia to the states. Id. at 383, 38 S.Ct. at 163 (emphasis added).
 
 
 102
 The Court found that these "fine-tuned" powers given to Congress in the Militia Clauses were created to "diminish" or limit the use of the awesome army power--and its attendant dominance over state authority--to those situations in which the exercise of such vast power was strictly necessary. Id. at 383, 38 S.Ct. at 163.
 
 
 103
 In concluding, the Court emphasized the care required in interpreting the conflicting authority of the army and militia provisions of the Constitution. It was true, said the Court, that the Militia Clauses provided Congress other ways, in addition to the Army Clause, to exert power over the militia. These other grants of positive authority, however, did not diminish the strength of the army power which, once properly exerted--or in the Court's words, exerted "only as in the discretion of Congress it was deemed the public interest required "--was "complete and dominant." Id. at 383-84, 38 S.Ct. at 163 (emphasis added).
 
 
 104
 Following from this, the Court found that the army power, when properly exercised, could "potentially" narrow the power of the Militia Clauses. There was no suggestion, however, that, absent an exigency, the integrity of the Militia Clauses could be compromised. The Court carefully emphasized that the army and militia powers were "distinct and separate," that both comprised meaningful areas of authority, and that neither area was to be "weakened or destroyed" by construing the other power too broadly. Id. at 384, 38 S.Ct. at 163.[22]
 
 B. The Lower Federal Courts
 
 105
 The majority cites two cases, Johnson v. Powell, 414 F.2d 1060 (5th Cir.1969), and Drifka v. Brainard, 294 F.Supp. 425 (W.D.Wash.1968), in support of its view that the Montgomery Amendment is constitutional as a necessary and proper exercise of Congress' army power. I doubt the validity of this view. Johnson and Drifka both arose during the Vietnam War where there was a declaration of national exigency.
 
 
 106
 In Johnson, National Guardsmen challenged the constitutionality of Pub.L. No. 89-687, 80 Stat. 981 (1966). This statute, enacted in the midst of the Vietnam War, provided the President with temporary authority, based upon a determination of presidential necessity, to order a member of the National Guard of the United States to active duty for up to 24 months.
 
 
 107
 The Guardsmen alleged, inter alia, that the statute violated Clause 15. Specifically, they asserted that, because the duty did not fall within the powers granted Congress in that clause (i.e., the duty did not involve insurrection, invasion, or the need to execute the laws), the statute was unconstitutional. The Court responded to this claim by stating that Pub.L. No. 89-687 was not enacted under the authority of Clause 15, but rather under the dual enlistment system which was based on the army power and the Necessary and Proper Clause.
 
 
 108
 Congress, two years prior to the enactment of Pub.L. No. 89-687, had declared the presence of a "national exigency" in the "Gulf of Tonkin Resolution." See Act of August 10, 1964, Pub.L. No. 88-408, 78 Stat. 384 (1964). In this resolution, Congress specifically found that the "deliberate and repeated" attacks on United States naval vessels in Southeast Asian waters "created a serious threat to international peace." It further declared that the "United States regards as vital to its national interest * * * the maintenance of international peace and security in southeast Asia." Therefore, the Congress declared its readiness, "[c]onsonant with the Constitution of the United States * * *, as the President determines, to take all necessary steps, including the use of armed force, to assist any member or protocol state of the Southeast Asia Collective Defense Treaty requesting assistance in defense of its freedom." Id. This statement of exigency, together with the exercise of the congressional powers to raise armies and to make laws under the Necessary and Proper Clause, provides a constitutional basis for Pub.L. No. 89-687.[23]
 
 
 109
 The Johnson court indirectly acknowledged that Pub.L. No. 89-687 was motivated by a threat to the national security. The Court stated that the "purpose" of the law was to make National Guard troops available to the federal government when the "national security" was threatened. 414 F.2d at 1063-64.
 
 V. The National Exigency Requirement
 
 110
 Like the Supreme Court in the Selective Draft Law Cases, this Court is now faced with the interplay of two constitutional provisions which have the potential to conflict in their exercise. Both have power and purpose, and thus in harmonizing these provisions, we must attempt to preserve as much of the authority of each as we sensibly can.
 
 
 111
 If the federal government can make the militia a federal force at will, the militia's intended purpose as a check on federal military power will be frustrated.[24] Moreover, the Framers' intent--particularly in light of the structure of the Militia Clauses--cannot be fairly read to support plenary federal control of the militia, absent a threat to the national security.
 
 
 112
 The majority declares that, under the Army Clause, the federal government can make the militia a federal force at will. It says that it can do this because the militia has been changed into: (1) the National Guard, and (2) the National Guard of the United States (NGUS). Thus, the majority argues that when the militia is ordered to put on its NGUS hat, it is available to the federal government any time the federal government wants, to do anything the federal government desires.
 
 
 113
 This cannot be right.
 
 
 114
 A power that the Constitution explicitly enumerates as a state power--a state power designed to check federal power and to protect the states from the exertion of federal power--cannot through "a mere form of words" be transformed into an unchecked instrumentality of federal power.
 
 
 115
 Based on these considerations, I conclude, as did the Court in the Selective Draft Law Cases, that before the federal government can exercise its army power to supersede the reserved state authority over the militia, its actions must be motivated by a "national exigency."
 
 
 116
 Implied in this requirement, to assure its observance, is the necessity of an affirmative declaration. Thus, before the legislative or executive branch can use the authority of the Army Clause to overcome reserved state authority over the National Guard, Congress or the President must first affirmatively assert the existence of a national exigency or of a specific threat to the national security.
 
 
 117
 The power to determine the existence of such circumstances belongs only to Congress or the President. Once this power is exercised, the substance of the determination cannot be challenged by the states or by individual National Guard members sent into federal service. See Martin v. Mott, 25 U.S. (12 Wheat.) 19, 30, 6 L.Ed. 537 (1827). Such a challenge would involve a central "political question," see Baker v. Carr, 369 U.S. 186, 213, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), and would hence not be justiciable.
 
 
 118
 It might be argued that the necessity of an affirmative declaration is thus meaningless. I believe, however, it is a serious undertaking for the President or for Congress to declare a national emergency. Such a declaration alerts the coordinate branches of government, the states, the citizens of the nation, and the nations of the world that the United States believes its interests are threatened and that it is prepared to take appropriate steps. It may at times be politically distasteful to an incumbent administration or to Congress to declare a national emergency, but ours is an open society and experience teaches that in matters of great import, support of the citizenry is essential.
 
 VI. From the Militia to the National Guard
 
 119
 Over the last eighty-five years, the federal government has gradually assumed greater control over the state militias. Congress has, however, consistently recognized the constitutional limits on its power to call the state National Guards into active service for training or operational missions in peacetime without gubernatorial consent. The Montgomery Amendment represents the first congressional departure from this recognition.
 
 A. The Dick Act of 1903
 
 120
 After the poor performance of state militia in the Spanish-American War, Congress began to use its Clause 16 power to "organize, arm and discipline" the militia, together with federal funds to improve the organization and coordinate the training of state militias. Thus, after 111 years, during which the national militia laws had been relatively unchanged,[25] Congress in 1903 passed the "Dick Act." Act of January 21, 1903, ch. 196, 32 Stat. 775. This law renamed the organized militias of the states the "National Guard" and provided federal funds to equip and to train them with regular army officers. This aid was conditional, however, on compliance with federal standards for training and organization.
 
 
 121
 The Dick Act carefully observed basic state authority over the National Guard. In this light, the War Department could not issue additional arms or assign regular army officers to state National Guard units until the state governor explicitly requested such assistance. 32 Stat. at 777. Similarly, National Guard units could not engage in joint encampments, maneuvers or field instruction with regular troops during summer training unless the governor made a formal request for such training. 32 Stat. at 777-78.
 
 B. The National Defense Act of 1916
 
 122
 The National Defense Act of 1916, ch. 134, 39 Stat. 166 (the 1916 Act), continued the use of federal funds as an inducement to further federal "organizational" control over state National Guards. The 1916 Act also recognized the constitutional limits on federal control over state National Guard forces by providing that "nothing contained in this Act shall be construed as limiting the rights of the States and Territories in the use of the National Guard within their respective borders in time of peace * * *." 39 Stat. at 198 (codified at 32 U.S.C. Sec. 109(b)). It also declared that sentences of dismissal or dishonorable discharge from the National Guard must be approved by the governors of the respective states. 39 Stat. at 209.
 
 
 123
 C. The National Defense Act Amendments of 1933
 
 
 124
 At the outset of World War I, it was believed that the Militia Clauses might prevent National Guard units from being called into federal service outside of the categories listed in Clause 15. Thus, volunteer units with high morale, which had trained together and were in a relatively high state of readiness, were disbanded when the war began. The government then drafted the individual members of these units into the Army, where they were reassigned to new units. This process not only hurt National Guard morale but was viewed as bad federal defense policy, given that trained units are generally in short supply at the beginning of crisis periods.
 
 
 125
 The 1933 amendments were primarily designed to remedy this problem by allowing the federal government to mobilize National Guard units intact "so as to eliminate the delay incident to draft." S.Rep. No. 135, 73d Cong., 1st Sess. 2 (1933); see also H.R.Rep. No. 141, 73d Cong., 1st Sess. 2 (1933). To accomplish this objective, Congress created the "dual enlistment" concept. Dual enlistment required the members of state National Guards to be concurrent members in a new entity called the National Guard of the United States (NGUS). The NGUS was a reserve component of the United States Army created under the authority of the Army Clause.
 
 
 126
 Based on this dual status, the 1933 amendments gave the President power to order the National Guard in its army status as the NGUS into federal service, but only in the event of a "national emergency" declared by Congress. In this light, the accompanying Senate report states that the "control, officering, and discipline [of the National Guard] except when ordered out pursuant to an emergency declared by Congress, [is left] with the respective States, just as at present. The relation of the Guard to the respective states during peace is in no wise affected or altered." S.Rep. No. 135 at 2. According to the House report, the 1933 amendments "reserv[ed] to the States their right to control the National Guard or the Organized Militia absolutely under the militia clause of the Constitution in time of peace." H.R.Rep. No. 141 at 5 (emphasis added).
 
 
 127
 Thus, contrary to the majority's view, the 1933 amendments did not change the degree of federal control over the National Guard but merely codified the existence of preeminent federal power in a national emergency or exigency. Acknowledging the limited change in federal control over the Guard affected by the 1933 changes, one federal district court has declared that the "National Guard, while something of a hybrid under both state and federal control, is basically a state organization." Mela v. Callaway, 378 F.Supp. 25, 28 (S.D.N.Y.1974); see also Maryland ex rel. Levin v. United States, 381 U.S. 41, 46, 85 S.Ct. 1293, 1296-97, 14 L.Ed.2d 205, vacated on other grounds, 382 U.S. 159, 86 S.Ct. 305, 15 L.Ed.2d 227 (1965) ("The National Guard is the modern Militia reserved to the States by Art. I, Sec. 8, cl. 15, 16, of the Constitution.").
 
 
 128
 The 1933 amendments recognized that federal authority over the National Guard in a national emergency is preeminent. In such a narrow circumstance, state authority is superseded, and thus there are no state limitations to avoid. The dual enlistment system was not a clever ploy by Congress to avoid at will the state powers embodied in the Militia Clauses. Rather, it was simply the statutory recognition of the constitutional principle that federal authority was supreme over the National Guard in national emergencies.
 
 D. The Armed Forces Reserve Act of 1952
 
 129
 The declared purpose of the Armed Forces Reserve Act of 1952, ch. 608, 66 Stat. 481 (the 1952 Act), was to bring together in one statute the laws relating to the reserve components of the various branches of the armed forces. See Should I Stay or Should I Go, supra note 15, at 193. Section 233 of the 1952 Act for the first time relied on the Army Clause powers of the Constitution to bring national guardsmen into federal service for training. The 1952 Act, however, specifically required that the federal authority requesting National Guard participation first obtain the consent of the relevant state governor.
 
 
 130
 Relevant to the present case are two provisions of the 1952 Act, now codified at 10 U.S.C. Sec. 672(b) and (d). These subsections provide the federal government with authority to call state guardsmen to active duty with the consent of their state governors. Federal training of state National Guard troops is done under the authority of these provisions. The provisions state:
 
 
 131
 (b) At any time, an authority designated by the Secretary concerned may, without the consent of the persons affected, order any unit, and any member assigned to a unit organized to serve as a unit, in an active status in a reserve component under the jurisdiction of that Secretary to active duty for not more than 15 days a year. However, units and members of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor of the State * * *.(d) At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member. However, a member of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor or other appropriate authority of the State * * *.
 
 
 132
 10 U.S.C. Sec. 672 (emphasis added).
 
 
 133
 If the gubernatorial consent requirement in these statutes were to be eliminated, the federal government would have plenary power to put the National Guard under its control at any time and for any purpose. Such a state of affairs would clearly frustrate the reserved state authority over the militia contemplated by the Constitution, particularly by the Militia Training Clause.
 
 
 134
 In this light, the United States Military Court of Appeals has found that the gubernatorial consent requirement of 10 U.S.C. Sec. 672(d) "has constitutional underpinnings in Art. I, Sec. 8 of the Constitution of the United States." United States v. Peel, 4 M.J. 28, 29 (C.M.A.1977) (footnote omitted); accord United States v. Self, 13 M.J. 132, 135 (C.M.A.1982); United States v. Hudson, 5 M.J. 413, 418 (C.M.A.1978). Moreover, although we owe no special deference to congressional judgments regarding constitutional questions, the available evidence indicates that Congress included the gubernatorial consent requirements in these provisions specifically to avoid potential conflict with reserved state authority.[26]
 
 E. The Montgomery Amendment of 1986
 
 135
 In 1986, the Governor of Maine refused to allow 48 members of the Maine National Guard to participate in a training mission in Honduras. After several other governors threatened to follow suit, a Senate subcommittee began to explore the question of whether the gubernatorial consent provisions of the 1952 Act should be abolished. See Hearings on Federal Authority Over National Guard Training Before the Subcommittee on Manpower & Personnel of the Senate Committee on Armed Services, 99th Cong., 2d Sess. (1986) (stenographic transcript) (1986 Senate Hearings). The hearings were held with short notice, and many who wished to testify against the proposal were unable to do so. 1986 Senate Hearings, supra, at 8. Among the governors objecting to this legislation were Gov. John H. Sununu, now President Bush's Chief of Staff, Gov. Thomas H. Kean (New Jersey), Gov. Mark White (Texas), Gov. Harry Hughes (Maryland), Gov. Victor Atiyeh (Oregon), Gov. James R. Thompson (Illinois), Gov. George Nigh (Oklahoma), Gov. Bill Allain (Mississippi), Gov. Norman H. Bangerter (Utah), Gov. Ed. Herschler (Wyoming), Gov. Richard D. Lamm (Colorado), Gov. Mario Cuomo (New York), Gov. William A. O'Neill (Connecticut), Gov. Gerald L. Baliles (Virginia), Gov. Madeline M. Kunin (Vermont), Gov. Bruce Babbitt (Arizona), Gov. John Carlin (Kansas), Gov. William J. Janklow (South Dakota), Gov. George A. Sinner (North Dakota), Gov. Arch A. Moore, Jr. (West Virginia), Gov. James J. Blanchard (Michigan), and Gov. Juan Luis (Virgin Islands).
 
 Former Gov. Sununu stated:
 
 136
 I want to go on record as opposed to * * * any legislative attempt to remove the authority or control of the National Guard from the states. This legislative initiative is directly contrary to the language and intent of the U.S. Constitution.
 
 
 137
 The National Guard, for over 200 years, has responded wherever and whenever our nation called. With gubernatorial control of the National Guard in peacetime, the nation has always had full confidence in the availability of this reserve force for war or national emergency. There is no evidence * * * that there is any less commitment to that responsibility today. The President will always have the prerogative, by federal statute, to call the National Guard in time of war or national emergency.
 
 
 138
 Comments of Governor John H. Sununu, entered into record of Hearings on Federal Authority Over National Guard Training Before the Subcommittee on Manpower and Personnel of the Senate Committee on Armed Services, 99th Cong., 2d Sess. (July 15, 1986).
 
 
 139
 The Department of Defense had counseled caution and hoped the crisis would fade over time.[27] In the end, the subcommittee took no action.
 
 
 140
 One month later, Rep. G.V. "Sonny" Montgomery of Mississippi submitted an amendment to the proposed Defense Authorization Act of 1987 that provided that a governor could not withhold his consent with regard to active duty outside the United States because of objections to the location, purpose or scheduling of the mission. See Cong.Rec. H6267 (daily ed. Aug. 14, 1986). Because the proposal took the form of an amendment to the defense bill, debate on it in the House of Representatives was limited to a total of ten minutes. Moreover, there were no hearings on the amendment before it reached the floor for a vote. In response, many representatives noted the fundamental impropriety in making such a great potential change in defense policy--if not in the constitutional balance of power--without the benefit of hearings, id. at H6262-68 (remarks of Reps. Edwards and Schroeder), and with such limited debate.[28] The consideration of the bill was further overshadowed by ominous recurring warnings to the representatives that if they did not act quickly to eliminate the gubernatorial consent requirement, the federal government would eliminate funding to their state National Guards.[29]
 
 
 141
 In the end, calls for deliberation and caution did not prevail, and the full House, after 10 minutes of debate, approved the Montgomery Amendment 261-159. At conference, the Senate defense bill did not contain the proposed amendment. The conferees, however, made one technical change in the House version and included a notation on legislative intent that allowed the governors to withhold consent if they needed the Guard for local emergencies.[30]
 
 
 142
 The effect of this amendment is to give the Defense Department unfettered authority over the state National Guard units. It permits the Department to call out the individual National Guard units for training or operational missions in peacetime and to do so in the face of objections on the part of the governor of the affected state. I believe that the Montgomery Amendment contravenes the intent of the Framers. It allows the federal government to make state National Guards part of a federal force in peacetime at will. It eliminates all check on federal military power by the states and frustrates state authority to resist operational and training missions of the National Guard when there is no threat to the national security and when no emergency has been declared. From time to time over the past 200 years, the Congress of the United States has taken steps to improve the effectiveness of the National Guard. Until 1986, however, it always recognized the restraints of the Militia Clauses of the United States Constitution.
 
 
 143
 Not only is the Montgomery Amendment contrary to the intent of the Framers, but it ignores the plain words of the Constitution, the decisions of the United States Supreme Court, and the decisions of the lower courts. Until Dukakis and Perpich were decided by the federal district courts, no federal court had held that Congress had the power under the Constitution to authorize the Defense Department to call out the National Guard in peacetime absent the declaration of an emergency. Every other case has involved a situation in which the Guard was called out in wartime or at a time when a national emergency had been declared.
 
 VII. Policy Arguments
 
 144
 The government argues that the Framers could not have foreseen the degree of dependence that the United States has placed on National Guard troops. If they had, the argument goes on, they would never have intended the states to possess the veto power given them in the 1952 Act. Thus, the government asserts that the gubernatorial consent requirement allows the states to participate in defense and foreign policy decisions in ways the Framers never would have sanctioned.
 
 
 145
 In response, the Framers made a conscious decision to place the bulk of the nation's defensive forces in the hands of state troops. Through much of American history, a large percentage of the nation's defensive forces have been organized in the form of militia or state National Guards. See supra note 3. Until 1986, state authority over these forces had been almost entirely unchanged by Congress. While it is true that the Framers did not want the states to make positive national defense or foreign policy, they did intend the states to be a check on potential abuse of military power by the federal government. In this light, the gubernatorial veto requirement of the 1952 Act is a particularly apt legislative adaptation of a constitutional concept.
 
 
 146
 The government argues that the Montgomery Amendment is necessary to ensure an effective national defense. However, it provides no evidence that the effectiveness of the national defense or of the National Guard will be diminished by an adherence to the constitutional principle of basic state control over the National Guard forces, absent a declaration of war or of national exigency.
 
 
 147
 In the last fifteen years, the National Guard has become a major part of the defensive force of the United States. After the Vietnam War and the presidential action discontinuing selective service registration, Congress decided to decrease the size of the standing military and to place increased reliance on reserve components, particularly on the National Guard. In this "Total Force" concept, the reserve components became major participants in the national defense effort.
 
 
 148
 The government maintains that the modern world has grown far more complex and dangerous than it was in 1787. The armed forces of the United States must today be able to respond rapidly to a broader range of potential threats to the national security than the Framers could have ever envisioned. Thus, the government argues, state-based limitations on federal control embodied in the Militia Clauses applied to a different time and different circumstances. The necessities of the modern world require this Court to act "pragmatically" and to read these anachronistic reserved powers either very narrowly or out of existence entirely.
 
 
 149
 The figures that the majority cites show that the National Guard is a major part of the defensive force of the United States. However, if the national security is in any way threatened, the federal government can quickly assume total control over the National Guard by declaring a national exigency. Thus, in any situation demanding quick action, there would be no state-controlled obstacles to hinder the government's response.
 
 
 150
 The government's second pragmatic argument follows closely from the first. Secretary Webb, in his Senate testimony, explains that, because of the nation's great dependence on the National Guard, these forces must be extremely well trained. This is necessary both so that they are prepared for all future emergencies and so that, at the appropriate time, they can mesh their operation with the regular army and other reserve components. See 1986 Senate Hearings, supra, at 56-6-8. Specifically, Secretary Webb asserts that the National Guard units must train in foreign environments with their unusual climates and terrain, alongside their full-time army and air force counterparts, in order to achieve "operational readiness." Any interference by obstinate state governors in this training process is likely to be disastrous in terms of the Guard's ability to operate effectively in a future crisis.
 
 
 151
 In response, all of the parties to this case agree that broad training experience for the National Guard is essential to the adequate defense of the United States. Indeed, even in the midst of the Honduran training controversy in 1986, Lieutenant General E.H. Walker, Chief of the National Guard Bureau,[31] stated:
 
 
 152
 [N]o governor has said he opposes overseas deployment training--all have said they wholeheartedly believe in it and understand and support the need for it.
 
 
 153
 1986 Senate Hearings, supra, at 95-5.
 
 
 154
 Since the Guard began training overseas in the early 1970's, no governor has ever withheld his or her consent to a training mission or any type of mission--until the National Guard began to train in Honduras. Moreover, states have never opposed training on the basis of terrain or climate. They have never opposed Guard exercises coordinated with regular forces. In short, they have never opposed the substance or content of training--nor are they likely to do so in the future. The states have only opposed an order for training when the real purpose of the order is something more than training. In the case of the Honduran controversy, the state objections all concerned the potentially dangerous implications that training in a politically explosive part of the world might have.[32]
 
 
 155
 In this light, the substance of the government's training argument is better understood. The government does not argue that gubernatorial consent prevents it from exposing Guardsmen to a proper diversity of climate or terrain or that it prevents Guardsmen from training alongside their full-time army and air force counterparts. This could be easily done in noncontroversial areas of the world, as it has in the past. The real essence of the government's argument must then be that the National Guard must train in areas of extreme political tension if it is to be an effective fighting force.[33] This could be the case, but the government has presented no evidence to support this argument.
 
 
 156
 Moreover, if the Honduran training controversy is a prototype of the dangers this country faces in the absence of the Montgomery Amendment, the following is of some interest. General La Vern E. Weber (Retired), former Chief of the National Guard Bureau, noted that the Honduran controversy had little effect on overall Guard training operations and suggested that any difficulties stemming from such a controversy in the future could easily be remedied through existing regulations and the withholding of federal funds from non-cooperative states. He stated:
 
 
 157
 Based on my discussions with key leaders of the Guard, it is my opinion that recent public comments and actions by state authorities have not impaired the nation's ability to rely on the National Guard nor have they adversely impacted the units' readiness.
 
 
 158
 I strongly agree and believe the recent actions are only an irritant which can be dealt with through existing statutes and regulations. The Chief of the National Guard Bureau has the authority to manage Federal funds appropriated for Guard training and can direct action as Chief of the agency serving as the line of authority between the Army and Air Force and the states.
 
 1986 Senate Hearings, supra, at 99.[34]
 
 159
 One last pragmatic consideration. It is important to realize that National Guard forces were involved in the recent invasion of Grenada and the bombing of Libya. In both of these instances, the Guard was activated under 10 U.S.C. Sec. 672, for "training", rather than under the operations provisions, 10 U.S.C. Secs. 673, 673a, 673b, which require a declaration of emergency or consultation with Congress. See Testimony of Secretary Webb, 1986 Senate Hearings, supra, at 83;[35] Comment, supra note 2, at 636. Some commentators have suggested that this use of these active duty provisions for "training" was "surreptitious" and designed to elude the statutory requirements for operational missions. See Comment, supra note 2, at 636. Whatever the case, prior to the Montgomery Amendment, the governors, as the representatives of their states, provided at least some check on the potential abuse of these provisions. Without the governors, there would be no check at all.
 
 VIII. Conclusion
 
 160
 The world has changed since 1787. It is smaller than it once was. Today's military forces need to be able to respond promptly. Yet, the world has not changed so dramatically that we can no longer abide by the explicit provisions of our Constitution. Congress simply cannot take away state control over the militia by calling the militia by a different name, NGUS, and by giving it concurrent federal duties.
 
 
 161
 Federalism is not yet meaningless. It remains a vital element in our constitutional system, both as a check on the unwise use of central power and a bulwark of the freedom that derives from local autonomy. In this light, it is undeniable that fundamental powers given to the states explicitly in the Constitution--whether these powers concern civil rights, property rights or state militias--cannot in the absence of the formal amendment process be rendered a legal nullity by the sheer force of a political expediency.
 
 
 162
 The requirement that the President or the Congress declare the existence of a national exigency--particularly when that statement is not subject to challenge--is a small concession indeed to the doctrine of separation of authority which underlies our constitutional system.
 
 
 163
 When the nation did not face a specific internal or external threat, the Framers wished part of the nation's military power to be under the control of the states to check the possibility of abuse of military power by the federal government. In this vein, the Constitution of the United States "reserv[es] to the States respectively * * * the Authority of training the Militia * * *." When the words and the intent come together in such a manner, our duty is clear. We must uphold the Constitution.
 
 
 
 *
 The HONORABLE GERALD W. HEANEY, a member of the original panel, assumed senior status on December 31, 1988
 The HONORABLE DONALD P. LAY, Chief Judge, did not participate in the consideration or decision of this case.
 
 
 [1]
 Reserve units and members of the National Guard of the United States may be activated "at any time * * * for not more than fifteen days a year," but not without the governor's consent:
 At any time, an authority designated by the Secretary concerned may, without the consent of the persons affected, order any unit, and any member not assigned to a unit organized to serve as a unit, in an active status in a reserve component under the jurisdiction of that Secretary to active duty for not more than 15 days a year. However, units and members of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor of the State or Territory, Puerto Rico, or the Canal Zone, or the commanding general of the District of Columbia National Guard, as the case may be.
 10 U.S.C. Sec. 672(b) (emphasis added).
 An individual reservist may be ordered to and retained on active duty "at any time" with the consent of both the reservist and the governor of his state guard:
 At any time, an authority designated by the Secretary concerned may order a member of a reserve component under his jurisdiction to active duty, or retain him on active duty, with the consent of that member. However, a member of the Army National Guard of the United States or the Air National Guard of the United States may not be ordered to active duty under this subsection without the consent of the governor or other appropriate authority of the State or Territory, Puerto Rico, the Canal Zone, or the District of Columbia, whichever is concerned.
 Id. Sec. 672(d).
 
 
 [2]
 The Montgomery Amendment, section 522 of the Defense Authorization Act for Fiscal Year 1987, provides:
 The consent of a Governor described in subsections (b) and (d) may not be withheld (in whole or in part) with regard to active duty outside the United States, its territories, and its possessions, because of any objection to the location, purpose, type, or schedule of such active duty.
 10 U.S.C. Sec. 672(f) (Supp. IV 1986).
 
 
 [3]
 The defendants, the Departments of Defense, Army, and Air Force and their Secretaries, and the National Guard Bureau and its Chief, are the individuals and entities authorized to order reserves to active duty under Sec. 672(b) and (d). We take judicial notice that other members or units of the Minnesota Guard have been or may be ordered to active duty for reserve training in Central America
 
 
 [4]
 The Honorable Donald J. Alsop, United States District Judge for the District of Minnesota
 
 
 [5]
 The States of Colorado, Maine, Massachusetts, Ohio and Vermont appear jointly as amici curiae in support of appellants. The National Guard Association of the United States (supported by the states of Alabama, Delaware, Florida, Georgia, Hawaii, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maryland, Mississippi, Missouri, Nevada, New Mexico, Oklahoma, Rhode Island, South Carolina, South Dakota, Texas, Utah, Wisconsin, and the Adjutants General Association of the United States and the Enlisted Association of the National Guard of the United States), the Firearms Civil Rights Legal Defense Fund, and the Military Order of the World Wars appear separately as amici curiae in opposition to appellants
 
 
 [6]
 "The term 'National Guard' means the Army National Guard and the Air National Guard." Id. Sec. 101(9). "Army National Guard" means:
 that part of the organized militia of the several States and Territories, Puerto Rico, the Canal Zone, and the District of Columbia, active and inactive, that--
 (A) is a land force;
 (B) is trained, and has its officers appointed, under the sixteenth clause of section 8, article I, of the Constitution;
 (C) is organized, armed, and equipped wholly or partly at Federal expense; and
 (D) is federally recognized.
 Id. Sec. 101(10). "Air National Guard" defines a like air force. Id. Sec. 101(12). Parallel definitions are found at 32 U.S.C.A. Sec. 101(4) (Army National Guard), (6) (Air National Guard).
 In this opinion we use "the Guard" to refer generally to the dually enlisted organized militia, adhering elsewhere to current statutory definitions in referring to the National Guard of the several States and the National Guard of the United States.
 
 
 [7]
 " 'Army National Guard of the United States' means the reserve component of the Army all of whose members are members of the Army National Guard." 10 U.S.C. Sec. 101(11). " 'Air National Guard of the United States' means the reserve component of the Air Force all of whose members are members of the Air National Guard." Id. Sec. 101(13)
 
 
 [8]
 In addition to the provisions of Sec. 672(b) and (d), Reserves may be ordered to active duty in the following circumstances:
 reserves may be ordered to active duty "in time of war or national emergency declared by Congress," for up to six months beyond the duration of the war or emergency, 10 U.S.C. Sec. 672(a);
 active duty for up to twenty-four months is authorized if the President declares a "national emergency," id. Sec. 673(a);
 the President may order a reservist to active duty for up to twenty-four months, if performance of his statutory reserve obligation has been delinquent or unsatisfactory, id. Sec. 673a(a);
 active duty for up to ninety days is authorized if the President "determines it is necessary to augment active forces for any operational mission," id. Sec. 673b(a); and
 commissioned officers of the Army National Guard of the United States may be ordered, with their consent, to active duty in the National Guard Bureau, id. Sec. 3496(a).
 
 
 [1]
 The Constitution provides that "No State shall enter into any Treaty, Alliance, or Confederation; grant Letters of Marque or Reprisal; * * * keep Troops, or Ships of War in time of peace, enter into any Agreement or Compact with another State, or with a Foreign Power, or engage in War * * *." U.S. Const. art. I, Sec. 10, cls. 1, 3
 
 
 [2]
 See Friedman, Conscription and the Constitution: The Original Understanding, 67 Mich.L.Rev. 1493, 1507-1541 (1969) (Friedman). Indeed, as delegate Edmund Randolph noted at the Virginia ratifying convention, "there was not a member of the federal convention who did not feel indignation" at the idea of a standing army. 3 J. Elliot, The Debates in the Several State Conventions on the Adoption of the Federal Constitution 401 (1901) (Elliot). See also Hirsch, The Militia Clauses of the Constitution and the National Guard, 56 U.Cin.L.Rev. 919, 924 (1988) (Hirsch); Comment, The Constitution and the Training of National Guard Officers: Can State Governors Prevent Uncle Sam From Sending the Guard to Central America?, 4 J.L. & Pol. 597, 600, 601 (1988) (authored by P. Fish) (Comment)
 
 
 [3]
 As the Supreme Court noted in United States v. Miller, 307 U.S. 174, 179, 59 S.Ct. 816, 818, 83 L.Ed. 1206 (1939), "The sentiment of the time [of the ratification of the Constitution] strongly disfavored standing armies; the common view was that adequate defense of the country and laws could be secured through the Militia--civilians primarily, soldiers on occasion." See also Hirsch, supra note 2, at 924. Apparently, this view was a longstanding one, for Hirsch notes that militia "did the bulk of the fighting, often with success, in the War of 1812, the Mexican-American War, the Civil War (for both the Confederacy and the Union), and the Spanish-American War." Id. at 943. Hirsch points out that for the duration of the nineteenth century, "the militia remained the primary military force of the country." Id. at 944. "By 1898," he notes, "the regular army had 18,000 troops, compared to 115,000 militiamen." Id
 
 
 [4]
 The United States, at the time the Constitution was ratified, was a nation of extreme isolationist sentiment. According to one noted commentator, "[P]eace was expected to be the customary state of the new nation. America would avoid aggressive war abroad and enjoy in turn 'an insulated situation' from the great powers of Europe * * *. This placid view of foreign relations precluded any explicit consideration of the use of American force abroad, except for defensive naval action * * *." W.T. Reveley, War Powers of the President and Congress 61 (1981)
 
 
 [5]
 Early in the Constitutional Convention, for example, Alexander Hamilton presented a proposal urging "the militia of all the States to be under the sole and exclusive direction of the United States, the officers of which to be appointed and commissioned by them." See J. Madison, Notes of Debates in the Federal Convention 164 (Hunt 1920). The Convention ignored Hamilton's proposal
 
 
 [6]
 Madison's notes from the Federal Convention indicate the strong opposition many delegates voiced to giving the federal government too much control over the militia
 Delegate Oliver J. Elsworth of Connecticut:
 The whole authority of the militia ought by no means to be taken away from the States whose consequence would pine away to nothing after such a sacrifice of power. He thought the [general] Authority could not sufficiently pervade the Union for such a purpose, nor could it accommodate itself to the local genius of the people. It must be vain to ask the States to give the Militia out of their hands.
 Delegate John Dickinson of Delaware:
 We are come now to a most important matter, that of the sword. His opinion was that the States never would nor ought to give up all authority over the Militia. He proposed to restrain the general power to one fourth part at a time, which by rotation would discipline the whole Militia.
 Madison's Notes of the Federal Convention, reprinted in, S.Rep. No. 695, 64th Cong., 2d Sess. 33 (1917) (The Militia ).
 
 
 [7]
 Delegate Elbridge Gerry of Massachusetts feared that federal control over the militia would "enslave the states" and lead to a "system of despotism." The Militia, supra note 6, at 31, 33
 
 
 [8]
 Madison's notes contain the following:
 Mr. [Roger] Sherman [of Connecticut], took notice that the States might want their militia for defense [against] invasions and insurrections, and for enforcing obedience to their laws.
 Id. at 34.
 
 
 [9]
 See Friedman, supra note 2, at 1512-20
 
 
 [10]
 The power of states-rights delegates to exact significant concessions from the nationalist delegates is demonstrated in the course of the debates at the Federal Convention. Mason offered three successive proposals to the Convention, each providing the states more authority over the militia than the last. Mason's final proposal sought to provide the federal government "regulatory" authority over the militia insofar as this was necessary to establish uniformity in training and arms so that the state forces could be melded into a cohesive force when the need arose. In the states' interest, Mason proposed that this federal regulatory authority would be limited to one-tenth part of each year, that appointment of officers would be in state hands, and that the states would be exempt from federal authority whenever they needed to use their militia on state business. This, however, did not satisfy the states-rights delegates, and the matter was referred to a central committee for resolution. The Militia, supra note 6, at 31-35
 
 
 [11]
 The Militia, supra note 6, at 34 (emphasis added)
 
 
 [12]
 Clause 16 provides Congress with the power to "discipline " the militia and reserves to the states "the Authority of training the Militia according to the discipline prescribed by Congress." Amicus curiae, the National Guard Association of the United States, argues that the term "discipline " provides a constitutional basis for federal control over the training process
 During the debates at the Constitutional Convention, Delegate Sherman suggested that the clause relating to training should be deleted, because he believed it "unnecessary." He believed that the states would obviously retain this authority unless they specifically ceded it to the federal government. The Militia, supra note 6, at 35.
 In response, Delegate Elsworth cautioned Sherman on this point. Madison's notes contain the following:
 Mr. Elsworth doubted the propriety of striking out the sentence. The reason assigned applies as well to the other reservation of the appointment to offices. He remarked at the same time that the term discipline was of vast extent and might be so expounded as to include all power on the subject.
 Id. After hearing Elsworth, Mr. Sherman withdrew his motion to delete the training clause. Id.
 Moreover, the debates at the Constitutional Convention indicate the power to discipline, at its broadest level of interpretation, means the power to prescribe methods of training, rules of conduct for the militia, penalties for the violation of such rules, and the means to administer these penalties. This power was believed necessary to assure potential coordinated movement on the field of battle. It also assured the federal government of troops who uniformly understood military rules of conduct and who understood that they were uniformly subject to the same penalties for infraction of these rules. See The Militia, supra note 6, at 35; see also Perpich v. United States Dep't. of Defense, 666 F.Supp. 1319, 1325 n. 9 (D.Minn.1987).
 
 
 [13]
 In a newspaper article urging the state of Maryland not to ratify the Constitution, Luther Martin, a delegate to the Federal Convention from that state, declared the proposed system would enable the government:
 wantonly to exercise power over the militia, to call out an unreasonable number from any particular state without its permission, and to march them upon and constitute them in remote and improper services. * * * In the proposed system the general government has a power not only without the consent but contrary to the will of the state government, to call out the whole of its militia, without regard to religious scruples, or any other consideration, and to continue them in the service as long as it pleases, thereby subjecting the freemen of a whole state to martial law and reducing them to the situation of slaves.
 Letter of Luther Martin in The Maryland Journal, March 18, 1788, reprinted in, The Militia, supra note 6, at 119; see also Remarks of Luther Martin before the Maryland House of Representatives, November 20, 1787, id. at 117-18. Similar fears were also expressed at the Pennsylvania ratifying convention. See Pennsylvania and the Federal Convention 598 (McMaster & Stone ed.).
 
 
 [14]
 Specifically, Hamilton declared that if the central government attempted such an abuse:
 whither would the militia, irritated by being called upon to undertake a distant and distressing expedition for the purpose of riveting the chains of slavery upon a part of their countrymen direct their course, but to the seat of the tyrants who had meditated so foolish as well as so wicked a project; to crush them in their imagined intrenchments of power, and to make them an example of the just vengeance of an abused and incensed people?
 The Federalist No. 29, Cooke at 186 (emphasis added).
 
 
 [15]
 For further evidence supporting this view of the second amendment, see 1 Annals of Congress, 749-52, 766-67 (J. Gales, ed. 1789); 1 S. Tucker, Blackstone's Commentaries: With Notes of Reference to the Constitution and Laws of the Federal Government of the United States and of the Commonwealth of Virginia App. 300 (1803); 3 J. Story, Commentaries on the Constitution of the United States Secs. 1890-91 (1833); Note, Should I Stay or Should I Go: The National Guard Dances to the Tune Called by Two Masters, 39 Case W.Res.L.Rev. 165 (1988-89) (Should I Stay or Should I Go )
 
 
 [16]
 There are other references to the militia in the Constitution. Art. II, Sec. 2, provides:
 The President shall be Commander in Chief of the Army and Navy of the United States, and of the militia of the several states, when called into the actual service of the United States * * *.
 Amendment V provides:
 No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger * * *.
 
 
 [17]
 See supra note 7
 
 
 [18]
 Specifically, Hamilton declared that a strong militia obviated the need for a potentially oppressive federal army:
 [I]f circumstances should at any time oblige the government to form an army of any magnitude, that army can never be formidable to the liberties of the people, while there is a large body of citizens little if at all inferior to them in discipline and in the use of arms, who stand ready to defend their own rights and those of their fellow citizens. This appears to me the only substitute that can be devised for a standing army; the best possible security against it, if it should exist.
 The Federalist No. 29, Cooke at 184-85.
 Next, responding to the argument that the Constitution's Militia Clauses provided the federal government the power to oppress the states with their own militias, Hamilton continued:
 There is something so far fetched and so extravagant in the idea of danger from the militia, that one is at a loss to treat it with gravity or with raillery * * *. What reasonable cause of apprehension can be inferred from a power in the Union to prescribe regulations for the militia, and to command its services when necessary; while the particular States are to have the sole and exclusive appointment of the officers? If it were possible seriously to indulge a jealousy of the militia upon any conceivable establishment under the Federal Government, the circumstances of the officers being in the appointment of the States ought at once to extinguish it. There can be no doubt that this circumstance will always secure to them a preponderating influence over the militia.
 Id. at 185 (emphasis added).
 In a similar vein, Madison wrote:
 Let a regular army, fully equal to the resources of the country be formed; and let it be entirely at the devotion of the Federal Government; still it would not be going too far to say, that the State Governments with the people on their side would be able to repel the danger * * *. To these [a standing army] would be opposed a militia amounting to near half a million of citizens with arms in their hands, officered by men chosen from among themselves, fighting for their common liberties, and united and conducted by governments possessing their affections and confidence. It may well be doubted whether a militia thus circumstanced could ever be conquered by such a proportion of regular troops.
 The Federalist No. 46, Cooke at 321 (emphasis added).
 
 
 [19]
 The draft was specified to be in accordance with Section 111 of the National Defense Act of 1916. That section read as follows:
 When Congress shall have authorized the use of the armed land forces of the United States, for any purpose requiring the use of troops in excess of those of the Regular Army, the President may, * * * draft into the military service of the United States, to serve therein for the period of the war unless sooner discharged, any or all members of the National Guard and of the National Guard Reserve. All persons so drafted shall, from the date of their draft, stand discharged from the militia and shall from said date be subject to such laws and regulations for the government of the Army of the United States as may be applicable to members of the Volunteer Army, and shall be embodied in organizations corresponding as far as practicable to those of the Regular Army or shall be otherwise assigned as the President may direct.
 The United States, in its brief to the Supreme Court, made it clear that it was discussing the authority of Congress to draft members of the militia in wartime. It stated:
 In an able article in 30 Harv.Law Rev., 712, Maj. S.T. Ansell (now Brigadier General and Acting Judge Advocate General) states (p. 715):
 Throughout our history the States have recognized the feasibility of parting with their organized militia when a national crisis has demanded it. In the Civil War the States parted first with their active militia in raising their quotas for the Federal Army, and the State organizations with their members became, when mustered into the service, United States Volunteers. The same thing prevailed in the confederacy during that period. In the war with Spain the Volunteer Army was raised in the same manner. Of course, in contemplation of law the militia has been taken not as militia, nor as militia organizations, but as individuals owing the Nation allegiance and service. Such a long-continued course of governmental conduct is not without significance.
 The Article concludes with the following adequate language (p. 723):
 A militiaman, organized or unorganized, is a citizen. Concededly an unorganized, or reserve, militiaman is subject to draft; otherwise, since all arms-bearing citizens are such militia, whence shall our armies come? An organized militiaman is no less a citizen and is much better prepared, largely at Federal expense, to make an effectual contribution to the country's cause in time of war.
 Selective Draft Law Cases, Brief for the United States at 59-60 (emphasis added).
 
 
 [20]
 But see Thoughts on the Conscription Law of the United States, in The Military Draft: Selected Readings on the Constitution 207-18 (M. Andresen ed. 1982) (draft opinion found in the papers of Chief Justice Taney finding that federal conscription law directed toward citizens, as opposed to militiamen, implicated (and in fact violated) the Militia Clauses of the Constitution); Freeman, The Constitutionality of Peacetime Conscription, 31 Va.L.Rev. 40 (1944)
 
 
 [21]
 Chief Justice White, four months later, in Cox, clarified that his holding in the Selective Draft Law Cases was based on the authority of the war and army powers exercised together
 
 
 [22]
 The Supreme Court has held that other constitutional provisions operate as a limit on Congress in military affairs. See Rostker v. Goldberg, 453 U.S. 57, 101 S.Ct. 2646, 69 L.Ed.2d 478 (1981) (army power must be used in manner consistent with the equal protection guarantees of the fifth amendment); Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971) (army power must accommodate the establishment clause of the first amendment); United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968) (army power must accommodate first amendment free speech). Furthermore, the Supreme Court specifically stated that Congress' power to declare war and to support armies is not plenary, Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 156, 40 S.Ct. 106, 108, 64 L.Ed. 194 (1919), but is subject to other applicable constitutional limitations
 
 
 [23]
 Drifka adopted a rationale similar to that stated in Johnson. 294 F.Supp. at 427-28
 
 
 [24]
 The United States District Court for the District of Massachusetts similarly found that the government's position concerning the power of the Army Clause leads to the "abolition" of the militia by leaving the Militia Clauses of the Constitution without practical application. Specifically, the court stated:
 Counsel for the defendants conceded at oral argument that [its] conception of the dual-enlistment system makes the militia dependent on Congress for its existence because, in a practical sense at least, the militia exists only when Congress does not want or need it as a part of the Army. Under such a dual-enlistment concept, pushed to the logical limit, Congress could at any time order the entire militia into active duty year-round, thus abolishing the militia and leaving the Militia Clause without practical application. A plain reading of the Constitution supports plaintiffs' contention that Congress cannot "abolish" the militia by transforming it into a part of the Army. See U.S. Const. amend. II ("A well regulated militia being necessary to the security of a free State ...)"; Militia Clause, supra, ("reserving to the States respectively ... the Authority of Training the Militia according to the discipline prescribed by Congress").
 Dukakis v. Dept. of Defense, 686 F.Supp. 30, 36 (D.Mass.), aff'd, 859 F.2d 1066 (1st Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 1743, 104 L.Ed.2d 181 (1988).
 In order to avoid these problems, the court departed from the government's position and distinguishd the Selective Draft Law Cases from the present controversy concerning the Montgomery Amendment by noting that the Selective Draft Law controversy arose in wartime. Thus, according to the court, it followed that the "present controversy presents the issue of accommodation between the Armies Clause and the Militia Clause in a context less compelling than that of Selective Draft Law Cases, for priority of the Armies Clause." Id.
 While all this appears clear--and consistent with this dissent--the Dukakis court concluded: "Nevertheless, guided by the decisions in the dual-enlistment cases as well as that of Selective Draft Law Cases," the states' reserved authority in the Militia Clauses "does not override the legitimately exercised power of Congress '[t]o raise and support Armies.' " Id. (emphasis added).
 The Dukakis court acknowledged that if the Militia Clauses are to have any continuing meaning, there must be a line of reserved state authority over which the federal government cannot cross. However, the court neither explained where that line is nor why it believed the Montgomery Amendment falls on the permissible side of that line.
 
 
 [25]
 The Uniform Militia Act of 1792, ch. 33, 1 Stat. 271, remained the primary law regulating the militia until 1903. For congressional activity between 1792 and 1903, see Should I Stay or Should I Go, supra note 15 at 179-85
 
 
 [26]
 Draft versions of the legislation that would become the 1952 Act provided that National Guard units could be ordered to active duty outside of the situations enumerated in Clause 15 or the declaration of a national emergency without first obtaining the consent of the relevant state governors. In response, witnesses who believed that such federal power violated the Militia Clauses filed "voluminous comments" with the Senate Armed Services Committee. See Reserve Components: Hearings on H.R. 4860 Before the Committee on Armed Services, 82d Cong., 1st Sess. 473 (1951)
 Specifically, General Ellard A. Walsh, a distinguished Minnesotan and spokesman for the National Guard Association, declared that a proposed bill without the gubernatorial consent requirement:
 concentrat[ed] too much power in the Executive and too much authority in the Department of Defense, and would in a number of instances infringe not only on the authority of the sovereign states but of the Congress as well.
 Id. at 483.
 Walsh maintained the bill without the gubernatorial consent provisions:
 very definitely violates the provisions contained in the militia clauses of the Federal Constitution, and notably article I, section 8, clause 16 thereof, which reserves to the states the appointment of officers and the authority of training the militia according to the discipline prescribed by Congress.
 Id. at 476, 482.
 Such an arrangement, Walsh argued, would disrupt the basic constitutional principle that the Guard must be "responsive to the orders of the governor." Id. at 478.
 Congress was also flooded with letters from state National Guard officials who pointed to the Militia Clause requirement for divided federal-state authority. Ernest Vandiver, Adjutant General for the State of Georgia, complained that the proposed bill "will delegate to the Pentagon the constitutional rights and powers imposed in the governors of the respective States to command their militia." Armed Forces Reserve Act: Hearings on H.R. 5426 Before the Senate Subcommittee on Armed Services, 82d Cong., 2d Sess. 312 (1952). The Adjutant General of Illinois, Leo M. Boyle, enclosed his prepared remarks protesting a prior proposal to "federalize" the National Guard. "I support the wisdom and farsightedness of our forefathers and the framers of the Constitution when they wrote the militia clause of the Constitution," Boyle wrote. "The National Guard system comprising as it does--citizen soldiers--has always been a bulwark against the concentration of military power in our Federal Government." Id. at 310.
 Thus, it appears that to counter the perceived "federalization" of the Guard, the National Guard Association proposed, among other things, an amendment requiring the consent of the governor of the State concerned before National Guard units could be called to active duty outside of national emergencies or the contingencies noted in Clause 15. Congress listened and enacted the gubernatorial consent provisions, 10 U.S.C. Sec. 672(b) and (d).
 
 
 [27]
 See Kester, State Governors and the Federal National Guard 11 Harv.J.L. & Pub.Policy 177, 179 (1988)
 
 
 [28]
 With regard to the limited debate concerning the Montgomery Amendment, Rep. Dyson stated:
 Mr. Chairman, the Guard has no greater friend than the Gentleman from Mississippi [Mr. Montgomery], but I think this is a bad idea. We have not had enough time to look into this; 10 minutes per amendment is not enough time to fully understand a proposal as important and as far reaching as this amendment.
 Cong.Rec. H6266 (daily ed. Aug. 14, 1986).
 Rep. Schroeder stated:
 Basically, whether you agree or disagree, I think we all agree that if [the Montgomery Amendment] is unconstitutional according to many constitutional scholars, and if we have never had hearings, and if it has been functioning this way for over 200 years, why in the world the rush to put this in with a 10-minute debate on the House floor?
 I think that is playing too fast and loose.
 Id. at H6267.
 
 
 [29]
 For example, Rep. Montgomery warned the members of the House:
 If we do not adopt this amendment, and as I have said earlier, the National Guard is dead in the water; you can forget about it. You Governors are going to lose all your equipment; you are going to lose a lot of payroll, so you had better support this amendment and let the Guard keep going.
 Cong.Rec., supra note 28, at H6267.
 Moreover, on July 15, 1986, James H. Webb, Jr. told a Senate Armed Services Subcommittee that an alternative to retaining the gubernatorial consent requirement was "to give the fullest resourcing * * * to those units that are able to participate in 'real world' training missions * * *." Prepared statement of Assistant Secretary of Defense for Reserve Affairs, see 1986 Senate Hearings, supra, at 5-14. Ten days later, on July 25, 1986, the House Committee on Armed Services strongly urged the chief of the National Guard Bureau to consider withholding funds from states that refused to participate in overseas training assignments. H.R.Rep. No. 718, 99th Cong., 2d Sess. 176 (1986).
 
 
 [30]
 Specifically, the conference report stated:
 The conferees reiterate that under this provision, the governor still will have the authority to block the training if he or she thinks the guardsmen are needed at home for local emergencies. The conferees intend that nothing about the words "location, purpose, type, and schedule" should constrain a governor in according appropriate priority to a state or local emergency, such as a flood or other natural disaster.
 Legislative History of Pub.L. No. 99-661, 99th Cong., 2d Sess. 475 (1986), reprinted in 1986 U.S.Code Cong. & Admin.News 6413, 6534.
 
 
 [31]
 10 U.S.C. Sec. 3040 provides:
 (a) There is a National Guard Bureau, which is a Joint Bureau of the Department of the Army and the Department of the Air Force, headed by a chief who is an adviser to the Army Chief of Staff and the Air Force Chief of Staff on National Guard matters. The National Guard Bureau is the channel of communications between the departments concerned and the several States, Territories, Puerto Rico, the Canal Zone and the District of Columbia on all matters pertaining to the National Guard, the Army National Guard of the United States, and the Air National Guard of the United States.
 
 
 [32]
 As Senator Glenn stated at the hearings:
 I know back in my own state of Ohio this question came up, why Honduras and why now? I think we ought to face that. That is the reason we are up against this thing now. Normally, we train in Panama--we have done that for a decade and a half or so--to give them jungle training.
 The issue we have to address here and we have only touched on it peripherally is why Honduras? I think the concept, the view of many of the governors, is that we are looking for [political] support for a policy that all Americans do not agree with by sending people to Honduras.
 I am being blunt about that, but that is the fact. That has been editorialized across the country. That is the issue here really. Does the training have to be in Honduras?
 When they were being ordered down to Honduras, it was the very time there were border crossings, with reports of several hundred people being killed. The governor had the National Guard there when the perception was that we are sending our people into the combat zone. That was the public perception.
 1986 Senate Hearings, supra, at 23.
 
 
 [33]
 General La Vern E. Weber (Retired), former Chief of the National Guard Bureau, discussed the government's position in his testimony to the Senate Subcommittee:
 I submit to you that such deployments are highly desirable, but not absolutely necessary to achieve combat readiness levels.
 National Guard units can be trained to Federal standards of professionalism right here in the United States, in the schools and maneuver areas Congress has provided for that purpose.
 Deployment to areas outside the CCNUS [Continental United States] is highly desirable as adventure training, to enhance morale and give the troops a broad experience, but I submit to you that in a training sense, driving a bulldozer in Fort McCoy, Wisconsin, is very similar to driving a bulldozer in Honduras.
 1986 Senate Hearings, supra, at 100-01.
 General Weber also stated:
 The narrow issue here is whether or not Congress believes that Federal training standards must include duty in Honduras, regardless of the arena of operation to which units are intended to be deployed in some future conflict. If the Congress believes that, then all Army and Air units, Regular Guard and Reserve must be sent to Honduras.
 Id. at 100.
 General Weber concluded:
 Any legislative action at this time would not serve to improve Guard readiness or availability in the event of emergency or war. If the Congress is concerned that the Chief of the National Guard Bureau cannot employ current directives to ensure proper training of the Guard forces, they can, and should, direct that he report periodically on any instances of refusal to train which are likely to adversely impact on readiness.
 Id. at 102.
 
 
 [34]
 General Walker described in careful detail the "crisis" in National Guard training operations that led to the Montgomery Amendment:
 In 1986 [the year the Montgomery Amendment was enacted] more than 42,000 members of the Army and Air National guards trained overseas in 46 countries. More than 9,000 Army and Air Guard personnel from 43 states and territories trained in Central America alone.
 * * *
 The few governors that have precipitated [the Montgomery Amendment] have stopped a total of 48 people from training in one country--Honduras--not the other 45 countries. Those 48 people constitute .0001 percent of the total deploying force--less people than report to sick call on an average base on a given day, less people than have had to forego scheduled training for employer support reasons and less people than have had to forego participation due to other commitments. Clearly 48 people in comparison to the total deploying forces or the entire Guard strength is insignificant in terms of impact.
 1986 Senate Hearings, supra, at 94-3-5 (emphasis added).
 
 
 [35]
 The following exchange concerning the recent bombing of Libya by American forces comes from the 1986 Senate Hearings:
 Senator Levin: Would [the Libyan raid] be treated as a training mission?
 Mr. Webb: That was under 672(d) which is for training.
 Senator Levin: So, that use of National Guard troops in Libya was considered a training mission by the DoD?
 Senator Warner: Under the law.
 Senator Levin: Is that the way DoD considered it, training?
 Mr. Webb: Under the law.
 What you have is the compression of missions once the Total Force Doctrine came into effect so that you have National Guard units all over the world on any given day under the rubric of 672, which is a problem because you have to go all the way from 672 to a Presidential 100-K call-up with very little in between.
 I understand where you are going and it is a problem. We have a difficult time defining what is an operational mission with the compression of these missions under the Total Force Doctrine.
 Senator Levin: I wondered whether DoD considered that a training mission in Libya? That is my question.
 Mr. Webb: I do not have authority to speak on how Secretary Weinberger would have termed that.
 Senator Levin: Could you answer that also for the record? Could you check with the Secretary's office and let us know that, too?
 1986 Senate Hearings, supra, at 82-83.
 Secretary Webb later sent the subcommittee the following written response to Senator Levin's question:
 The Air National Guard aircraft utilized in support of the Libyan raid was already in Europe as part of routine tanker task force activities. Under long standing practice, Guard and Reserve air refueling aircraft supplement active force refueling aircraft assigned to a tanker task force stationed in Europe. The tanker task force provides day-to-day refueling training opportunities to Guard and Reserve crews, and is also available to the theater commander to meet any operational requirement that may arise. The Libyan raid was just such an operational requirement. The Guard aircraft was not sent to Europe for the specific purpose of participating in the Libyan raid. Under section 672(d) the crews can be on active duty, including active duty for training. The crew of this Guard aircraft was on active duty.
 Id. at 83 (attachment).